MINNEAPOLIS STREET RAILWAY COMPANY v.
CITY OF MINNEAPOLIS.
TWIN CITY MOTOR BUS COMPANY v. SAME.

86 N. W. (2d) 657.

November 22, 1957—Nos. 36,948, 36,949.

44

*Charles A. Sawyer,* City Attorney, *Montreville J. Brown, Benno F. Wolff,* and *Oppenheimer, Hodgson, Brown, Baer & Wolff,* for appellant.

*James E. Dorsey, Dorsey, Owen, Barker, Scott & Barber,* and *Clarence O. Holten,* for respondents.

MURPHY, JUSTICE.

This is an appeal from an order of the District Court of Hennepin County vacating a rate order of the Minnesota Railroad and Warehouse Commission by which the commission established rates of fare to be charged by the complainant-appellant for the carrying of passengers within the city of Minneapolis and the city of Columbia Heights. The proceeding was begun in 1954 by the Minneapolis Street Railway Company by a petition to the commission to increase rates to be charged to persons using its transportation facilities. The company sought to eliminate a special fare, 5 tokens for 90 cents, authorized by the order of the commission dated April 24, 1953, and to obtain a regular straight 20-cent fare. It also requested permission to add a

2-cent charge for every transfer.

In an order dated July 6, 1955, the commission denied the requested increase and issued an order which reduced rates in two respects: (1) It reduced the fare from 5 tokens for 90 cents, or 18 cents per token, to 4 tokens for 70 cents, 17½ cents per token, and (2) the order reduced charges for intercity rides between Minneapolis and St. Paul from 2 fares, or 2 tokens, to 1½ fares, or 1 token plus 10 cents. The cash fare rate of 20 cents was not altered. It was determined the fares established would provide a return of 7.12 percent on a rate base of $9,138,000.[1]

The street railway company appealed this order to the District Court of Hennepin County. The district court temporarily stayed the order

---

[1]

"RATE BASE

| | | |
|---|---|---|
| "LAND | | $ 368,719 |
| BUILDINGS | | 1,370,918 |
| PASSENGER BUSES | | 4,926,368 |
| EQUIPMENT OTHER THAN BUSES | | |
| Autos and trucks | $ 12,503 | |
| Shop and garage tools | 112,159 | |
| Fare boxes | 6,408 | |
| Miscellaneous equipment | 7,395 | |
| Furniture and office equipment | 49,572 | |
| | 188,037 | 188,037 |
| Total Owned Property | | 6,854,042 |
| Material and supplies | | 89,000 |
| Working capital | | 150,000 |
| Total | | 7,093,042 |
| Plus: Leased Buses: | | |
| Approximate cost | $2,135,000 | |
| Delivery cost | 17,464 | |
| | $2,152,464 | |
| Less 6 mo. depreciation to Dec. 31, 1954 | 107,624 | |
| | $2,044,840 | 2,044,840 |
| COMMISSION RATE BASE, Dec. 31, 1954 | | $9,138,000" |

pending final determination of the appeal, upon the condition that the company issue receipts to passengers who might request them for purchased tokens or fares paid on intercity trips. On February 29, 1956, the district court vacated the order of the commission. The city of Minneapolis seeks to reverse the order of the district court and affirm the action of the commission.

Also involved in this appeal is an order of the commission to similarly reduce the fare to be charged by the Twin City Motor Bus Company on the one route which it operates in Minneapolis. Its other routes are to suburban communities. The commission, after indicating that both transit companies are wholly owned subsidiaries of the Twin City Rapid Transit Company, found that it could not "for practical as well as discriminatory reasons, permit two different rate structures to exist in the City of Minneapolis." This order likewise vacated by the district court. Since the fare to be charged by the Twin City Motor Bus Company on this one line will depend entirely upon the rate which the Minneapolis Street Railway Company is permitted to charge, our discussion will be limited to the Minneapolis Street Railway Company rates.

The statutory basis of the commission's power in this case derives from M. S. A. 221.04 which empowers it "to fix just, reasonable and nondiscriminatory rates," for every auto transportation company.

Prior to 1954 the Minneapolis Street Railway Company operated rail facilities under M. S. A. c. 220, commonly referred to as the Brooks-Coleman Act, which relates to street railways. In 1952 the company began a conversion from a street railway to an exclusive motorbus operation. In order to accomplish the changeover from streetcars to motor buses the company was required to discharge its obligation to the city under the terms of its franchise to operate a street railway, and in 1952, engaged in negotiations with the Minneapolis City Council with reference to that subject. The city council by ordinance dated October 30, 1953, and amended November 27, 1953 (79 Minneapolis Council Proceedings, pp. 428, 533), required the company as a condition precedent to discontinuance of streetcar operations to comply with the following conditions:

A. To pay the city of Minneapolis $922,790 in installments over eight years.

B. To perform work on the streets prior to December 31, 1955, at a cost to the company not exceeding $300,000.

C. To furnish the city with a quitclaim deed to the Lake Harriet right-of-way.

On November 27, 1953, the company duly accepted the terms of the ordinance as amended so as to relieve itself of its franchise obligations.

The conversion was completed in June 1954 and all street railway equipment not used or useful in motorbus operations was retired. In October 1954 these hearings were commenced under c. 221 to fix and establish rates to be charged for carrying passengers within Minneapolis. The resulting order of July 6, 1955, is the basis of this appeal.

The order of the commission of July 6, 1955, was based upon the commission's figures as to revenues, operating expenses, and figures as to the items making up the rate base for a pro forma period of 12 months ending September 30, 1955.[2] There is no dispute as to revenues

---

[2]The figures for the pro forma, or test period (October 1, 1954, to September 30, 1955), which were taken for the purpose of making adjustments of revenue and expenses to be used in determining a permanent rate base, are substantially in agreement except for the items of (1) amortization of abandonment losses, (2) losses on obsolete material, and (3) special track-removal work. The following is a copy of a table contained in the commission's report, findings of fact, and order, which sets forth side by side the company's figures and the commission's figures as to the various items.

"Minneapolis Street Railway Company
REVENUE AND EXPENSES FOR PRO FORMA YEAR
October 1, 1954—September 30, 1955
(at present fares)

| "Line No.<br>Co. Exh. 8 | Company Estimate<br>(Co. Exhibit 8)<br>(7½% decline) | | Commission<br>Estimate<br>(7½% decline) | |
|---|---|---|---|---|
| | Amount | Per Mi. | Amount | Per Mi. |
| 5. OPERATING REVENUE<br>(Present Fares)<br>EXPENSES | $9,720,000 | | $9,720,000 | |

for that period. The figures in dispute are those as to operating expenses and rate base. A major portion of the dispute grows out of the contention of the company that one-half of its losses resulting from abandonment of property resulting from changeover should be charged to operating expenses over a period of years and considered in a rate structure which would yield a reasonable return to the company.

The issues, as framed by the briefs, present three principal questions. (1) Is the company entitled to a rate of fare which will compensate it for abandonment losses resulting from the changeover? This point involves the question of whether or not such losses actually exist and, if they do, what percentage of such loss shall be sustained

| | | | | | |
|---|---|---|---|---|---|
| 6. | Maintenance of plant & equip. | $1,030,000 | 7.2 ¢ | $1,001,000 | 7.0¢ |
| 7. | Operating garage | 930,000 | 6.5 | 901,000 | 6.3 |
| 8. | Transportation | 3,750,000 | 26.2 | 3,750,000 | 26.2 |
| 9. | Traffic | 29,000 | .2 | 29,000 | .2 |
| 10. | Injuries and damages | 429,000 | 3.0 | 429,000 | 3.0 |
| 11. | Pension, sick leave, etc. | 586,000 | 4.1 | 586,000 | 4.1 |
| 12. | Operating rents | 57,000 | .4 | 57,000 | .4 |
| 13. | Rent of leased buses | 516,000 | 3.6 | ............ | ...... |
| 14. | Other general expense | 358,000 | 2.5 | 358,000 | 2.5 |
| | Total Lines 6 to 14 | $7,685,000 | | $7,111,000 | |
| 18. | Operating taxes (Excluding income tax) | 570,000 | | 570,000 | |
| | Total Lines 6 to 18 | $8,255,000 | | $7,681,000 | |
| 20. | Depreciation | 804,000 | | 765,000 | |
| | Plus depn. allowed on rented buses | ............ | | 215,000 | |
| | Total depreciation allowed | 804,000 | | 980,000 | |
| 23. | Amortization of abandonment losses | 322,000 | | 62,500 | |
| 24. | Loss on obsolete material | 6,000 | | ............ | |
| 25. | City of Minneapolis notes | 92,000 | | 92,000 | |
| 26. | Special track work removal | 200,000 | | ............ | |
| 28. | Total Lines 23 to 26 | 620,000 | | 154,500 | |

by the company and what percentage shall be assumed by patrons of the company through increased fares. (2) The second point grows out of the obligation of the company as provided by the ordinance requiring payment of the $922,790 in notes and an additional sum of $300,000 track-removal expense. Did the commission act unreasonably and arbitrarily in allowing the note obligation to be charged as an operating expense over a period of ten years and at the same time disallow the sum of $300,000 as a "non-recurring item of expense"? (3) Did the commission act unreasonably and arbitrarily by fixing the valuation of certain old buildings of the company on a basis of book cost less depreciation?

### Abandonment Losses

The company argues that if the rate of fare, as established by the commission, does not compensate it in substantial amounts to offset its abandonment losses represented by the undepreciated balances of discarded property the solvency of the company will be imperiled. It

| | | | |
|---|---|---|---|
| 29. | Total revenue deductions (Lines 6 to 28) | $ 9,679,000 | $8,815,500 |
| 30. | Balance (Line 5 minus 29) | $ 41,000 | $ 904,500 |
| | Vehicle Miles | 14,300,000 | 14,300,000 |
| | Revenue Passengers | 51,900,000 | 51,900,000" |

The considerable disparity in the company's estimate of expense by reason of rent for leased buses in the sum of $516,000 (line 13) is compensated by the commission's allowance of the sum of $215,000 (line 20) as a depreciation expense on rented buses. The commission, noting that passengers are required to pay a sufficient fare to take care of depreciation and operating expense and to furnish a fair return on property used in conducting the operation, held that the management has a duty to furnish the equipment necessary to conduct the operation and concluded that the proper way to handle this particular item was to treat it as though the company owned the vehicles and to include the value thereof in the rate base "for the reason that they are used and useful in conducting the operations, and to allow an annual depreciation charge thereon at the usual rate as an item of expense." There does not seem to be any contention that the commission abused its discretion in handling the accounting feature of this question in that way.

argues that it must recoup these losses from property not fully depreciated, the useful life of which had not expired, by fares charged to future passengers. It argues that the conversion occurred for the benefit of passengers riding after the conversion, that the changeover arose from a public demand, and that the public is now receiving the benefit of modern urban transportation. Such being the case, it asserts, the public should properly bear a portion of the cost of the changeover. If this share of the cost is not realized by the company in increased fares it warns that its credit will disappear, the enterprise will not be able to attract new capital, and the stockholders will suffer a complete loss of their investment.

The company asserts that according to its books the abandonment losses amount to $7,613,246.08. The commission, for the purpose of computing a fare, recognized only $1,251,521 of this amount. The company also claims a $6,000 annual expense as "loss on obsolete material" which the commission rejected in toto. It points out that the commission has rejected from consideration in determining a rate base the sum of $6,361,725 of the company's record on abandonment losses. It suggests that this sum be divided equally, one-half to be charged to the stockholders and the other one-half to be charged over a period of 10 years to operating expenses.

The company further asserts that the findings of the commission are unsupported by the evidence and claims that it was denied due process of law by reason of the fact that it had no notice that the amount of abandonment losses, as evidenced by the company's books, would be questioned; it argues that the question of these losses was not litigated and that there was no evidence taken with reference to costs, actual or estimated, or with reference to the correctness of the company's depreciation reserve; and it asserts that it was given no opportunity to show the value of its property not fully depreciated at the time of the conversion nor was it given an opportunity to meet the claim of the city that the company's depreciation reserve was incorrect.

The city at one point in its brief urges that none of the alleged abandonment losses should have been charged to future operating expenses. However, the city's principal contention before this court is

that it is within the discretion of the commission to determine the actual loss, if any, and the method by which such loss shall be handled from an accounting standpoint; and also that the evidence is sufficient to support the findings of the commission. It asserts that the commission acted reasonably in refusing to recognize as "actual losses" many of the book losses claimed by the company and that any losses actually incurred upon conversion should be losses to the stockholders whose "management stayed in the streetcar business too long, and who chose to invest their money in an enterprise * * * that has been an unfortunate one to be an investor in * * *." It argues that the obselescence of streetcars was not something that happened over night. It is claimed obsolescence started years before the conversion to buses and that as long ago as 1948, in proceedings before the commission, attention to obsolescence of the property of the company had been noted, and that the company was out of step with the rest of the transit industry in retaining obsolete forms of transportation in place of converting to buses. It asserts that amortization on account of abandonment losses arising from changes in the industry which reasonably should have been anticipated may not be charged as an expense to operating income.

As heretofore noted, the company claims $7,613,246.08 as abandonment losses of which the commission allowed $1,251, 521. The company also claims $6,000 annual expense as "loss on obsolete material" which the commission rejected in toto. The commission disallowed these amounts for two reasons: (1) The book figures of the company were insufficient to prove an "actual loss" and (2) the depreciation reserve on the company books does not represent the total accumulated charges due to the deduction from reserve of substantial amounts as a charge for rehabilitation of streetcars and other items. As to the $1,251,521 loss which it did allow the commission amortized one-half over a 10-year period as an operating cost to be borne by the passengers in the form of higher rates. The other half was amortized over a 10-year period against the surplus account, whereby that portion of the loss is to be borne by the investors.

The district court, in reversing the commission's findings, stated that "Since the Commission's Order of July 3, 1925, the books and

reports of the Company have been available to the Commission. Valuations as of January 1, 1922, were fixed by said order * * * and from time to time since adjusted." And pointing out that such established valuations had been used as a basis for determinative findings by the commission on other issues in the matter, the court held that it was error for the commission to adopt values established by the books with respect to some losses but not others and concluded that the commission failed to treat the abandonment losses as a class fairly and consistently and acted arbitrarily beyond the exercise of reasonable discretion and judgment.

■ We must initially state the principles of law which should govern the determination of whether such losses exist and how they should be treated for rate-making purposes. In determining the rate of fare to be charged, the commission proceeded upon the theory that the rate should be sufficient to provide anticipated revenue which will equal the anticipated operating expenses plus a reasonable rate of return on property which is included in the rate base of the company. It is recognized that any obsolescence losses included as a factor in computing returns must be borne by the customer rather than the investor. The question of importance to the customer is not which method of accounting should be selected to accomplish an increased rate; the question is whether an obsolescence loss should be charged to them at all.[3]

Obsolescence has been defined as a "loss in an investment in property resulting from inventions or technological changes." Obsolescence creates different problems than are encountered in allocating physical depreciation because of the difficulty in forecasting the extent to which service life of property will be shortened by technological changes. See, Troxel, *Obsolescence of Public Utility Property,* 14 Journal of Land and Public Utility Economics, 266.

Treatment of obsolescence losses has been discussed in relatively few reported court decisions. In Kansas City So. Ry. Co. v. United States, 231 U. S. 423, 34 S. Ct. 125, 58 L. ed. 296, the court stated

---

[3]The increase might be accomplished through an increased rate base, rate of return, or operating expenses. Cook, *Abandoned Property and the Rate Base,* 17 Accounting Rev. 243, 249, 250.

that abandonment losses must be written off against operating revenue to protect the integrity of the property accounts against permanent inflation, but whether such loss should be charged against surplus or as an operating expense in future years is a question of policy. In that case the court held that it was not an abuse of power for the commission to charge the losses as operating expenses. So long as the commission acts fairly and reasonably, either decision will be affirmed.

In Pacific Gas & Elec. Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. ed. 1075, the court reversed a decision of the district court which had upheld a gas rate fixed by ordinance which failed to include obsolescence caused by new patents. On the premise that (265 U. S. 413, 44 S. Ct. 540, 68 L. ed. 1082) "justice demands that the utility company should profit in some substantial proportion by the economies brought about by its ability * * *," the majority held that failure to include any valuation for obsolete property in arriving at a rate base resulted in confiscation. This authority might be distinguishable on the facts from the case before us because the court there noted that the obsolescence in question could not have been long anticipated. Mr. Justice Brandeis dissenting, and arguing as the city contends here, said that the lower court found, as facts, that the change in process was not revolutionary; that the change resulting in obsolescence should have been foreseen; and that a reserve had been accumulated but was written off earlier to surplus. Further, the dissent argued that whether the rate is confiscatory depends in part upon whether the return includes any of the risk of obsolescence.

In Los Angeles Gas & Elec. Corp. v. Railroad Comm. 289 U. S. 287, 306, 53 S. Ct. 637, 644, 77 L. ed. 1180, 1193, the court discussed utility investment which is "no longer used and useful for the public." The court stated that whatever may be said of including the abandoned property in a valuation based on historical cost (289 U. S. 311, 53 S. Ct. 646, 77 L. ed. 1195) "we perceive no reason for embracing unnecessary facilities in an estimate of cost of reproduction." The court emphasized that in arriving at a rate the commission must exercise its judgment and concluded that the discretion of the commission was not

unreasonably exercised.

The recent case of Washington Gas Light Co. v. Baker, 88 App. D. C. 115, 188 F. (2d) 11, involved the retirement of abandoned utility property and we believe that the principles stated there should govern the issue of retirement of abandonment losses in this case. The court of appeals reversed an order of the Public Utilities Commission of the District of Columbia which granted a rate increase. It held that the record and findings of the commission with reference to abandoned property were inadequate. It cited the Los Angeles case for the proposition that abandoned property should not be included in an estimate of the cost of reproduction for rate-base purposes. The court pointed out that primary emphasis (88 App. D. C. 123, 188 F. [2d] 19) "is now being placed not on 'specific property, tangible and intangible,' but on capital prudently invested and embarked on an enterprise in the public service," and observed that this "theory contemplates that rates will enable the investor to maintain his original prudent investment intact until it is recovered through annual charges to depreciation expense, * * *. If a unit of property resulting from prudent investment becomes obsolete before it has been recovered in full by the investor (either through annual depreciation charges or through returns sufficient to compensate for such inadequacy), it is not necessarily erroneous as a matter of law for the Commission to include it in the rate base until such recovery has occurred. Such a course may be necessary in order to assure efficiency and progress in the art and the continued attraction of capital to the enterprise." But the decision emphasizes that inclusion of such factor in the rate base must meet the test of justice and reasonableness to the consumer as well as to the investor, and it cites Freeman, *Public Utility Depreciation,* 32 Cornell L. Q. 4, 9, which refers to obsolescence or "functional depreciation" as a risk for which compensation may be included as a component of a fair rate of return and points out that if allowance is made for this risk as a part of the rate of return and also as a depreciation expense the consumer is twice charged.

In applying the test of justice and fairness to the consumer as well as to the investor, the court in the Washington Gas Light Co. case stated (88 App. D. C. 123, 188 F. [2d] 19):

"* * * As we have indicated, the rate of return to which the investor is entitled is measured in part by the risks of the business as compared with those of comparable enterprises. It thus becomes relevant to determine whether or not investors have, during the useful life of this property, been compensated for assuming the risk that it would become inadequate or obsolete before the investment in it was entirely recovered. Such compensation may have been made either through inclusion of obsolescence (1) as one of the elements used in calculating depreciation expense, or (2) as a risk considered in fixing the permissible rate of return. If, in the past, the risk of obsolescence was provided for in either of these two ways, then the abandoned property should not be included in the rate base today. If it were, then the investor would be paid for the occurrence of the very eventuality the risk of which he had been consciously carrying and for which he had already been paid. The effect upon the consumer would be the same as if an insured person were required to assume the loss against which he believed himself protected by payment of premiums. The result would clearly violate the consumer interest against 'exorbitant' rates."

The court further concluded that the record and findings before it were inadequate to determine whether the investor had been compensated for this risk and determined that such inquiry must first be made by the commission. It added that (88 App. D. C. 124, 188 F. [2d] 20) "It seems likely, however, in view of the prevalence in the past of the doctrine that abandoned property would not be included in the rate base (regardless of whether depreciation accruals had resulted in complete recovery to the investor), that investors have been compensated for the risk of obsolescence." See, Freeman, *Public Utility Depreciation,* 32 Cornell L. Q. 4.

Under the prior decisions of this court, the rate base for carriers regulated by M. S. A. c. 220 includes only property which is "used and useful in connection with the public service of the carrier." E. g., St. Paul City Ry. Co. v. City of St. Paul, 242 Minn. 188, 206, 64 N. W. (2d) 487, 498. No attempt has been made in the instant case to include abandoned property in the rate base as attempted in the Washington Gas Light Co. case. Rather, the company here desires to amortize

the alleged loss over a 10-year period as an operating expense. But in both cases the fundamental issue is whether the consumer or investor will bear the loss. Hence, the principle stated in the Washington Gas Light Co. case regarding that issue may be adopted here even though the company in this case has sought a different method of accounting in attempting to charge the loss to the consumer. The principle of law which should guide the discretion of the commission in determining whether the consumer or investor will be charged with the amount of alleged loss due to obsolescence is *twofold*: *First,* the future consumer may not be charged for obsolescence through any method of accounting unless the investor has suffered an actual loss by not having fully recovered prudently invested funds.[4] *Secondly,* even if such loss has occurred, it is unreasonable to charge the consumer if the investor has been compensated for assuming the risk of obsolescence.

■ In applying the first of these two governing principles to the facts of this case, we must now determine whether the commission acted reasonably by accepting the book value in determining "actual loss" with respect to some losses and not others. The company contends, and the district court found, that this action by the commission was arbitrary and inconsistent. To the extent that the remaining book value of the property in question is not an accurate reflection of an actual loss (i. e., prudently invested capital which the investor has not recovered), such book value may not be amortized as an operating expense to the detriment of future passengers.

We cannot say, however, that it is unreasonable for the commission to place the burden upon the company of establishing to the reasonable satisfaction of the commission that the book losses represent an actual loss of prudently invested funds, particularly where the city has raised

---

[4]When property is rendered no longer useful for public service by reason of obsolescence, and past earnings have failed to permit the providing of an ample reserve for its retirement or writeoff, it is equitable that the retirement of the remaining value, after deducting salvage and after the application of such portion of the depreciation reserve, if any, accumulated for the ultimate retirement of the property in question, should be permitted to be amortized out of earnings as an operating expense over a period of years. Re Lincoln Traction Co. 43 P. U. R. (N. S.) 535.

considerable doubt about the reliability of certain portions of these books. The commission seems to have imposed this burden by stating that "the Company contented itself with showing book loss in substantiating its claim for an allowance of retirement expense." The findings, however, are not clear enough in this matter to enable us to determine with certainty what burden was imposed by the commission upon the company. If the commission does impose this burden on the company and the company fails to sustain it in regard to any property on which a loss is claimed, the commission may reasonably refuse to accept such portion of the company books as proof of actual loss.

The reasonableness of imposing such a burden on the company is clearly illustrated by several facts. First, the validity of the book cost as a definition of original cost depends upon the correctness of the accounts, and such accounts may frequently include items which cannot be included as a part of the original cost for rate purposes, particularly in the absence of "searching supervision" in the form of audits of company records and inspection of the physical property of the company by the staff of a regulatory commission. See, Barnes, The Economics of Public Utility Regulation, pp. 404, 568; State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294. Secondly, the testimony in the record indicates that two book entries in particular may have led the commission to doubt the reliability of company books as proof of actual loss, and led the commission to impose upon the company the burden of establishing that the book losses reflect actual losses. The commission, however, made no reference to either entry in its findings. It appears from the record and briefs that the sum of $2,891,109.94, which had been written off company books in 1904, was restored to the company books by an ex parte order of the commission in 1951. In the absence of satisfactory explanation of this circumstance, we believe that the commission could have reasonably disallowed this amount as an abandonment loss upon the grounds that the only permissible inference is that the property was properly written off as having been fully depreciated in operations prior to 1904.

Likewise the evidence relating to the Harriet right-of-way transaction might have led the commission to doubt the reliability of company

books as proof of actual loss. The evidence indicates that the Minneapolis Street Railway Company purchased this right-of-way from the Minneapolis Suburban Railway for $814,473 shortly before it was transferred to the city of Minneapolis in settlement of franchise obligations. Both companies are subsidiaries of the Twin City Rapid Transit Company. Professor Barnes, in The Economics of Public Utility Regulation, which the company cites as a "leading work" on the problem of original costs, states (p. 405):

"Much more serious is the question that arises when utility assets have been sold by one utility company to another. Is original cost the actual cost to the present utility corporation, or is it the cost to the original utility? This question has not always been answered uniformly, but the weight of authority favors the cost to the corporation that first devotes the property to the public service. This is the meaning that the Interstate Commerce Commission has consistently attached to the term. * * * And this requirement * * * has been upheld by the Supreme Court * * *. [The reason] is obvious; a transfer of the property may be the occasion for including in the capital accounts such things as 'write-ups' in the value of the property, discounts on securities, costs of financing, promoters' profits, and extravagant payments for the acquired property."

The commission, however, made no reference in its findings to either the Harriet right-of-way transaction or the 1904 writeoff.

The tax consequences may also be considered in determining the extent to which the company has suffered an actual loss and the extent to which the investor or customer should bear it. See, St. Paul City Ry. Co. v. City of St. Paul, 242 Minn. 188, 64 N. W. (2d) 487.

In allowing the item of $1,251,521 loss, the commission recognized losses in connection with certain streetcars referred to as PCC cars, and the powerplant. The commission may have recognized these two classes of property because an actual loss as to each was fairly demonstrable by the record. The brief for the city argues that the PCC cars were not depreciated on the basis of any historical depreciation but were depreciated on a straight-line depreciation method and that the powerplant represented a large item of property clearly identifiable,

the loss on which, following its sale to the Northern States Power Company, was fairly established. With reference to the other great mass of property, the city points out that the book values do not reflect actual values, since that property is on the books classified by accounts and not specific properties and has been depreciated on the basis of a composite rate of three percent per year without reference to specific items of property or the age of such property. The findings of the commission, however, do not state any of the facts upon which it based its conclusion that an actual loss was not sustained on those items.

■ In view of these facts, we do not believe that it would necessarily be arbitrary or unreasonable for the commission to accept some book figures of the company as proof of actual loss and reject others. However, the findings themselves do not sufficiently reflect the facts considered by the commission in reaching this result to permit us to determine whether its action was lawful and reasonable and whether the findings are reasonably supported by the evidence.

Since the findings are not adequate to enable us to determine whether the commission's action relating to the existence of abandonment losses is lawful and reasonable, the general principles concerning the scope of judicial review of an order issued by the Railroad and Warehouse Commission require us to remand the case to the commission for further findings. The company should be permitted to introduce further evidence in support of its claim that prior rates or depreciation charged have not compensated it for loss of abandoned property.

■ The function of the district court is to determine whether, in light of all the evidence presented before the commission and district court, the commission's order was lawful and reasonable; and upon appeal to this court the question is not whether the evidence reasonably sustains the district court's findings, but whether all the evidence presented reasonably sustains the district court's finding on whether the commission's order was lawful and reasonable; the court may not substitute its judgment for the findings of the commission and it may not try the case de novo. M. S. A. 216.25; State v. Duluth, M. & I. R. Ry. Co. 246 Minn. 383, 75 N. W. (2d) 398; State v. Chicago & N. W. Ry. Co. 246 Minn. 403, 75 N. W. (2d) 411; Twin City Motor

Bus Co. v. Rechtzigel, 229 Minn. 196, 38 N. W. (2d) 825. Section 216.24 specifically requires the commission to file with any district court to which an appeal is taken a certified copy of the order appealed from "together with findings of fact on which the same is based." Section 216.25 provides that such findings of fact shall be prima facie evidence of all matters therein, and the burden of proof upon all issues raised by the appeal shall be on the appellant. In a rate proceeding the commission must make findings of fact sufficiently specific to enable a court sitting in review to determine whether or not the commission was influenced only by matters properly within its purview in reaching the result, and all of the essential basic facts upon which the order is based must be found. State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294. Also, see Davis, Administrative Law, §§ 161 to 163, discussing the sufficiency of the findings of administrative tribunals. While the "zone of propriety" between mere conclusion and undue particularity cannot be sharply defined, we hold that the findings of fact made by the commission relating to abandonment losses are not adequate to enable this court to determine whether the exclusion of $6,361,725 alleged as "abandonment losses" was lawful and reasonable and supported by the evidence.[5] Moreover, the mere statement that the "reasons above given for disallowing retirement losses likewise apply on obsolete material" is not a sufficient finding that no actual loss exists on the obsolete materials.

■ We are aware that it may be difficult for the company to produce complete records showing how much of each individual asset has been depreciated, or to what extent the risk of obsolescence has not been previously compensated for by past rates. However, the company, in assuming its burden of proof, must produce evidence based on records which it should reasonably be expected to have, and in the absence of complete evidence, the commission may apply its experience and background of knowledge to reach a just result. We have recog-

[5] The holding regarding findings in St. Paul City Ry. Co. v. City of St. Paul, 242 Minn. 188, 64 N. W. (2d) 487, must be distinguished since that case was governed by c. 220 (Brooks-Coleman Act), which provides for a trial de novo in district court. Both parties recognized that no such provision exists in c. 221.

nized that the rate-making power is legislative and that "The commission is informed by experience in its exercise and is specially constituted to weigh the evidence and determine the facts by which the exertion of the power is governed. In complex and delicate cases much weight attaches to its judgment." State v. Tri-State T. & T. Co. 204 Minn. 516, 526, 284 N. W. 294, 302; Board of Trade v. United States, 314 U. S. 534, 548, 62 S. Ct. 366, 372, 86 L. ed. 432, 443; Davis, Administrative Law, § 248. The company will have to present such facts as it can and the commission will have to apply its own expertness based upon those facts to make its decision.

■ We have stated that it would be unreasonable to charge the passengers for loss due to obsolescence if the investor has been compensated for assuming the risk of such loss. The findings of the commission permitted one-half of all actual losses to be charged to investors and the other half to be charged to the future customers by amortizing it as an operating expense over a 10-year period. Neither party has seriously challenged that finding before this court. The company requested this result and agreed to assume one-half of all abandonment losses. While the city evidently requested that the commission charge all losses to the investor, its chief argument on appeal is that the discretion of the commission should be affirmed. Hence we need not examine or disturb this finding. It is worth noting, however, that the distribution of actual obsolescence losses between future passengers and investors is a question of reasonableness under the circumstances of each case. The principle of charging one-half to each has been upheld as reasonable in past cases,[6] but it should not be considered as a rule of law which *must* be applied in *all* cases.

### TRACK-REMOVAL EXPENSE

■ The second issue in dispute, which related to the $300,000 track-removal expense, grows out of the ordinance adopted by the city of Minneapolis to provide for the paving, surfacing, and restoration of

---

[6]E. g., St. Paul City Ry. Co. v. City of St. Paul, 242 Minn. 188, 64 N. W. (2d) 487. See, Pacific Gas & Elec. Co. v. City and County of San Francisco, 265 U. S. 403, 416, 44 S. Ct. 537, 541, 68 L. ed. 1075, 1083 (Mr. Justice Brandeis' dissent).

the city streets and payment for work in connection therewith as a condition to the discontinuance of streetcar service on lines in the city of Minneapolis. It was necessary for the company to consent to the terms of this ordinance before the streetcar routes could be abandoned and bus routes substituted in place of them. The commission recognized, as part of the rate structure, the $922,000 franchise settlement which was represented by notes of the company payable in installments over a period of eight years, and approved payment of them as an operating expense. The commission held, however, that the obligation of the company in connection with track-removal expense in a sum not to exceed $300,000 was a nonrecurring item of expense which "we do not think should be placed as a burden on the riders in estimating expenses for a permanent fare * * *." The lower court took the view that both obligations grow out of "one indivisible transaction" and held that in treating them differently the commission's action was arbitrary and unreasonable.

The company contends that the only difference between the notes and the payment for track removal is the period over which they occur, one being over eight years and the other being over slightly more than two years. The city contends that both items were in fact treated alike since each is allowed as expense in the year in which the obligations become payable and that as a matter of fact the commission treated the track-removal expense in the manner originally suggested by the company. The city argues that the commission allowed $92,000 of the payment for the franchise settlement of the obligation to maintain, repair, and remove the space between the rails of tracks, as an expense for the pro forma period since a charge in the same amount would recur annually for the next eight years. They argue that the $300,000 track-removal item, or the unpaid balance thereof, was to be paid during the pro forma period. There was to be no recurrence of that item in future years, and consequently it was not a matter for consideration in the establishment of permanent rates of fare.

The facts are that the city agreed to accept payment of the $922,790 obligation in monthly installments over a period of years. There was no such agreement with reference to the $300,000 item. That item was to be paid when the track-removal work was completed in a con-

templated period of two years. In holding that these obligations might be charged to operating expenses during the years they became payable, we cannot say that the commission abused its discretion. This was a matter for the commission to determine in the exercise of its judgment and it was not for the lower court to substitute its judgment in place thereof. See, Twin City Motor Bus Co. v. Rechtzigel, supra. In State v. Tri-State T. & T. Co. 204 Minn. 516, 527, 284 N. W. 294, 302, we said:

"The powers of the reviewing court are purely judicial and wholly lacking in legislative attributes. Its function is to protect constitutional rights, not to sit as a board of revision with appellate legislative authority to substitute its own judgment for that of the commission."

## VALUATION OF BUILDINGS

On the third issue, which relates to the valuation of buildings for rate-base purposes, the company contends that the commission's valuation of older buildings at book cost less depreciation is erroneous, and this contention is supported by the order of the district court. The district court held that the commission acted arbitrarily in taking book cost less depreciation in its valuation of the old buildings and that this resulted in inconsistent treatment as between old and new structures since the book value of old buildings was "grossly below" the "present-day" value.

The commission set the total valuation of all buildings as of $1,370,918. This included several new buildings constructed within the last few years as well as several old buildings constructed between 1900 and 1915. The commission used the book value of these buildings less depreciation as its standard of valuation for all buildings. The company contended that for rate-making purposes these buildings should have been valued at "reproduction cost discounted to percent condition." There is no dispute concerning the newer buildings because they were built so recently that both formulas would result in substantially the same figures. The dispute grows out of the valuations placed on the older buildings. Present-day value was assigned to the land.

The commission received into evidence expert estimates of the present

value of the old buildings. The opinions of the experts varied considerably as illustrated by the estimates on the garages. The company expert valued them at $645,721 by using a piecemeal reproduction-cost valuation whereby the expensive old materials used in the original plans were valued at present-day prices. One of the city experts arrived at a value of $352,050 by predicating his valuation upon the use of more economical modern materials. Another city expert valued these buildings at $300,699 by using the market valuation. Finally, the commission expert arrived at a value of $485,081 by a piecemeal valuation with a further reduction for those portions of the buildings which are no longer useful. This marked variation in the premises and conclusions of the experts should provide ample illustration for the statement quoted by the commission that "it should be unnecessary to discuss at great length the defects and vagaries of the reproduction cost doctrine which at best is an illusory concept as a requisite of rate making."[7] Arriving at a present fair replacement value has been described as "the most speculative undertaking * * * in the entire history of English jurisprudence." West v. Chesapeake & Potomac Tel. Co. 295 U. S. 662, 689, 55 S. Ct. 894, 905, 79 L. ed. 1640, 1656.

The city contends that the attempt by the company to value the older buildings on a piecemeal reproduction cost basis is not sound and that under the circumstances it was speculative and conjectural. We cannot agree with the company's view that, as applied to the facts here, the true value should be fixed somewhere within the limits of valuation as expressed by the witnesses for the opposing parties. We have held that the finder of fact is not bound by the opinion of any witnesses concerning values and that its findings will be sustained if they are within the limits of the evidence as to value and reasonably supported by the evidence as a whole. See, Carroll v. Pratt, 247 Minn. 198, 76 N. W. (2d) 693; Knutson v. Lasher, 219 Minn. 594, 18 N. W. (2d) 688; Lovrenchich v. Collins, 233 Minn. 183, 46 N. W. (2d) 264. Since a large portion of the structure value, as shown by

---

[7]See Federal Power Comm. v. Hope Natural Gas Co. 320 U. S. 591, 597, 64 S. Ct. 281, 285, 88 L. ed. 333, 342, which holds that the commission may find that reproduction cost new is not a suitable measure for fixing a proper rate base.

the books, represented present-day costs, and present-day value was assigned to the land, we cannot say that the commission acted unjustly or unreasonably in accepting book value less depreciation in its valuation of all buildings, new as well as old.

In determining the value of the old buildings for rate-making purposes on the basis of book cost less depreciation, the commission proceeded upon the theory that this court would adopt the holdings of the United States Supreme Court in Federal Power Comm. v. Hope Natural Gas Co. 320 U. S. 591, 64 S. Ct. 281, 88 L. ed. 333. We are accordingly called upon to indicate whether we will adopt that authority, or whether this jurisdiction will follow the so-called "fair value rule" as set forth in Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. ed. 819. The latter case held that the owner of private property devoted to public use is entitled to a fair return on the fair value of his property devoted to public use; and in ascertaining the value of such property the following factors should be considered: The original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earnings and revenue of the utility, and the sum required to meet operating expenses. It further held that a utility is entitled to a (169 U. S. 547, 18 S. Ct. 434, 42 L. ed. 849) "fair return upon the value of that which it employs for the public convenience." This rule has been criticized by members of the United States Supreme Court in various cases.[8]

In criticism of the rule it has been said that the factors included

---

[8] Driscoll v. Edison Light & Power Co. 307 U. S. 104, 59 S. Ct. 715, 83 L. ed. 1134 (Mr. Justice Frankfurter concurring); McCart v. Indianapolis Water Co. 302 U. S. 419, 58 S. Ct. 324, 82 L. ed. 336 (Mr. Justice Black dissenting); State of Missouri ex rel. S. W. Bell Tel. Co. v. Public Service Comm. 262 U. S. 276, 43 S. Ct. 544, 67 L. ed. 981 (Mr. Justices Brandeis and Holmes concurring); St. Louis & O'Fallon Ry. Co. v. United States, 279 U. S. 461, 49 S. Ct. 384, 73 L. ed. 798 (Mr. Justices Brandeis, Holmes, and Stone dissenting); West v. Chesapeake & Potomac Tel. Co. 295 U. S. 662, 55 S. Ct. 894, 79 L. ed. 1640 (Mr. Justices Stone, Brandeis, and Cardozo dissenting); Federal Power Comm. v. Natural Gas Pipeline Co. 315 U. S. 575, 606, 62 S. Ct. 736, 752, 86 L. ed. 1037, 1060 (Mr. Justices Black, Douglas, and Murphy concurring).

in it cannot be reconciled and that "value" cannot be a composite of all of its elements. Moreover, the different standards included in the rule, when applied in a particular case, must lead to widely varying results.[9]

Mr. Justice Brandeis thought that the rule failed "to afford adequate protection either to capital or to the public" and that "It leaves open the door to grave injustice."[10] His views stated in 1923 that "the present price level may fall to that of 1914 within a decade; and that, later, it may fall much lower" was substantiated by the subsequent collapse of 1929. He advocated a rule which would serve adequately as a guide regardless of whether prices were rising or falling. This rule, referred to as the prudent investment theory, was stated as " 'capital honestly and prudently invested must, under normal conditions, be taken as the controlling factor in fixing the basis for computing fair and reasonable rates.' * * * The adoption of the amount prudently invested as the rate base and the amount of the capital charge as the measure of the rate of return would give definiteness to these two factors * * * which are now shifting and treacherous, and which render the proceedings peculiarly burdensome and largely futile. * * * The rate base would be ascertained as a fact, not determined as matter of opinion. It would not fluctuate with the market price of labor, or materials, or money. It would not change with hard times or shifting populations. It would not be distorted by the fickle and varying judgments of appraisers, commissions, or courts. It would, when once made in respect to any utility, be fixed, for all time, subject only to increases to represent additions to plant, after allowance for the depreciation included in the annual operating charges."[11]

Mr. Justice Brandeis further pointed out that, because of the fluc-

---

[9]Mr. Justice Brandeis in his concurring opinion in State of Missouri ex rel. S. W. Bell Tel. Co. v. Public Service Comm. 262 U. S. 276, 295, 43 S. Ct. 544, 549, 67 L. ed. 981, 988.

[10]State of Missouri ex rel. S. W. Bell Tel. Co. v. Public Service Comm. 262 U. S. 276, 292, 43 S. Ct. 544, 548, 67 L. ed. 981, 987.

[11]State of Missouri ex rel. S. W. Bell Tel. Co. v. Public Service Comm. 262 U. S. 276, 301, 303, 306, 43 S. Ct. 544, 551, 553, 67 L. ed. 981, 991, 992, 993.

tuation of values, any effort to apply reproduction cost or present-day value was fairly certain to operate at one period against the public and in favor of the utilities, and at a later period against the utilities and in favor of the public and only by adopting actual-cost and prudent-investment criteria could these difficulties be avoided.

These views, which were shared by Mr. Justice Holmes, later found support in the dissenting opinion of Mr. Justice Stone in St. Louis & O'Fallon Ry. Co. v. United States, 279 U. S. 461, 551, 49 S. Ct. 384, 410, 73 L. ed. 798, 838, wherein it was observed that although the court had held that "present reproduction costs must be considered in ascertaining value for rate making purposes" the court had not said that such evidence, "when fairly considered, may not be outweighed by other considerations affecting value, or that any evidence of present reproduction costs, when compared with all the other factors affecting value, must be given a weight to which it is not entitled in the judgment of the tribunal [the ICC], 'informed by experience' and 'appointed by law' to deal with the very problem now presented." It was not until 13 years later (1942) that Mr. Chief Justice Stone found an opportunity to set forth this flexible approach to rate-making problems when in writing for the court in Federal Power Comm. v. Natural Gas Pipeline Co. 315 U. S. 575, 586, 62 S. Ct. 736, 743, 86 L. ed. 1037, 1049, he held that "The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas." He asserted that they were free to make the "pragmatic adjustments" which may be called for under the circumstances.

In 1944, in Federal Power Comm. v. Hope Natural Gas Co. *supra,* the United States Supreme Court held that (320 U. S. 602, 64 S. Ct. 287, 288, 88 L. ed. 345) "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." The order of the commission "is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries

the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." The decision further points out that the rate-making process involves (320 U. S. 603, 64 S. Ct. 288, 88 L. ed. 345) "a balancing of the investor and the consumer interests." It recognizes that "regulation does not insure that the business shall produce net revenues," for it is not the duty of the commission to provide a margin which protects against unwise policy or improvident management, but that the rate should provide a return "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital."

The Federal Power Comm. v. Hope Natural Gas Co. case, *supra,* was discussed in Market St. Ry. Co. v. Railroad Comm. 324 U. S. 548, 564, 567, 65 S. Ct. 770, 778, 779, 89 L. ed. 1171, 1183, 1184, in which the court observed that a commission is not required to fix rates "on the present reproduction value of something no one would presently want to reproduce, or on the historical valuation of a property whose history and current financial statements showed the value no longer to exist, * * *" and that "It was no constitutional error to proceed to fix a rate in disregard of the theoretical reproduction costs." See, also, United States v. Toronto, Hamilton & Buffalo Nav. Co. 338 U. S. 396, 70 S. Ct. 217, 94 L. ed. 195; Utah Power & Light Co. v. Public Service Comm. 107 Utah 155, 152 P. (2d) 542; Colorado Interstate Gas Co. v. Federal Power Comm. 324 U. S. 581, 65 S. Ct. 829, 89 L. ed. 1206.

The doctrine in Smyth v. Ames, *supra,* has been recognized in this state in Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220, and State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294, decided before the Hope case. In In re Applications to Fix Streetcar Rates of Fare, 228 Minn. 435, 442, 37 N. W. (2d) 533, 537, decided after the Hope case, we held that it would violate due process to set a rate which would not yield a reasonable return on the "fair value" of utility property at the time it is being used. We believe that holding is sound since the statutes applicable in that case, §§ 220.10 and 220.11, require "a reasonable return on the fair value." The statute with which we are concerned, however, is § 221.04, which merely requires that the rate fixed by the commission be "just,

reasonable and nondiscriminatory," which is almost identical to the language used in the Federal statute involved in the Hope case.

Appellate courts have been unsuccessful in attempts to devise a rule or set of rules which would lead a commission to unerring judgment in rate-making cases. As has been pointed out, the reproduction cost or fair-value standard is unworkable by reason of the time required to make the valuations, the heavy expense involved, and the unreliability of results obtained, and even recent state authorities which have been necessarily influenced by it, by reason of the statutes involved, recognize its infirmities. Iowa-Illinois Gas & Elec. Co. v. City of Fort Dodge, 248 Iowa 1201, 1233, 85 N.W. (2d) 28, 47 (September 1957); Simms v. Round Valley Light & Power Co. 80 Ariz. 145, 294 P. (2d) 378 (1956). Wisconsin is committed to the prudent-investment theory. Milwaukee & Suburban Transport Corp. v. Public Service Comm. 268 Wis. 573, 68 N. W. (2d) 552 (1955). But in light of the economic conditions of our times it cannot be said that the prudent-investment principle should be strictly applied in every instance. It is unrealistic to assume that the dollar value of prudent investment, made prior to the successive inflationary advances from 1941 to the present, represents a norm to which price levels may recede at sometime in the future.[12]

No attempt should be made to circumscribe the functions of the commission by a hard-and-fast rule. An appellate court must recognize that the authority to make rates is a legislative function delegated to the commission and that its orders "command the same regard and are subject to the same tests as enactments of the legislature." State v. Tri-State T. & T. Co. 204 Minn. 516, 520, 284 N. W. 294, 299. We are concerned only with whether the commission has exercised its power "to fix just, reasonable and nondiscriminatory rates" (§ 221.04) and in the final analysis we can only state in broad outline the standards which it should follow and require findings to

---

[12]Iowa-Illinois Gas & Elec. Co. v. City of Fort Dodge, *supra.* In State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294, and in Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 535, 248 N. W. 220, 225, we held that the utility is entitled to a return upon increment to the value of the plant since installation.

support the decision reached.

In stating a rule for the commission to follow we find it difficult to improve on our statement in State v. Tri-State T. & T. Co. *supra*. If that decision is properly interpreted, so as not to require specific findings as to reproduction cost in each instance, it is substantially consonant with the decision of the United States Supreme Court in the Hope case, for we said in the Tri-State case that valuation (204 Minn. 535, 284 N. W. 306) "cannot be determined with precision for it is not derived from the application of a formula, but must be reached through the exercise of a reasonable judgment, guided, but not ruled, by the results of the foregoing processes according to the weight, which depends upon the circumstances, attributable to each." The process used in determining value for rate-making purposes should include capital honestly and prudently invested in property used and useful in the public service of the utility, which should be considered as a constant but not controlling factor. Other elements which may be considered, depending upon the circumstances in each case, include original cost plus additions, less retirements and accrued depreciation; reproduction cost as of the time of the inquiry less accrued depreciation; the financial history of the company; the market value of its stocks and bonds; and all other relevant facts. All of these factors should be given the weight to which they are entitled in the judgment of the commission, and in reviewing the order of the commission so as to determine whether the rate fixed is "just, reasonable and nondiscriminatory" it will be viewed in its entirety to determine whether it meets the requirements of the act. If the order cannot be said to be unjust, unreasonable, and discriminatory, it will be affirmed.

The order of the commission should be recognized as the product of expert judgment which carries a presumption of validity. Such an order will not be disturbed where it appears that the commission has (1) fairly considered the investor's interest with concern for the financial integrity of the company whose rates are being regulated so as to provide a return commensurate with returns or investments of other enterprises having corresponding risks, so as to assure confidence in the financial integrity of the enterprise and to maintain its credit and attract capital; and (2) has fairly balanced those considerations

against the just interests of the public who are required to pay the fares imposed.

In holding that the commission, in order to arrive at a "just, reasonable and nondiscriminatory" rate, is not bound by any single formula we do not mean to say that the commission is relieved of the duty to make findings of fact essential to permit a review of its conclusions. If a review is to serve any real purpose, the findings must necessarily reflect the facts upon which the order is predicated. The findings should be sufficiently specific to enable a court to review the decision of the commission and ascertain whether the facts afford a lawful and reasonable basis for the order, and such findings "should be stated in such detail as to show separately the various items which had to be considered by the commission in reaching its decision." 73 C. J. S., Public Utilities, § 56.

The order of the district court is affirmed insofar as it relates to the subject of abandonment and obsolescence. In considering that subject in further fare hearings, the commission should be guided by the views expressed in this opinion. The order of the district court is reversed and the findings of the commission are affirmed with reference to the subject of (a) track-removal expense in a sum not to exceed $300,000 which was treated as an operating expense during the years incurred and not included in the permanent rate structure, and (b) the valuation of the buildings which was determined on a basis of book value less depreciation for rate-making purposes.

The order of the district court of Hennepin County dated August 15, 1955, with reference to receipts for fares issued by the company thereunder shall remain in effect until the further order of the commission.