In the Matter of NEW YORK WATER SERVICE CORPORATION, Petitioner, *v.* PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent.

Third Department, December 30, 1960.

*Simpson Thacher & Bartlett* (*Richard Jones, Cyrus R. Vance, Maxwell E. Cox* and *J. Daniel Mahoney* of counsel), for petitioner.

*Kent H. Brown, George H. Kenny* and *Norman Abell* for respondent.

BERGAN, P. J. The petitioner New York Water Service Corporation supplies water as a public utility in five separate local areas of the State. It formerly serviced a much more extensive population. The acquisition of some of its former plants by local condemnation and the resulting mutations in both its financial structure and in the nature of its business activities largely give rise to the present controversy with the Public Service Commission.

On the commission's findings of the petitioner's rate base in 1959, water rates have been approved by the commission which will yield an over-all return on investment of 6.49%. The petitioner challenges the rate base and other computations as found by the commission on several grounds which we find to be insufficient in law to warrant judicial interference.

One of the main points in issue between petitioner and commission is the disallowance of certain substantial expenses as part of the rate calculation. In 1959 the petitioner's plants in

Rochester and White Plains were eliminated from its system by condemnation. In determining what part of the petitioner's expenses might be considered as properly to be weighed into the rates chargeable in the remaining five districts, the commission eliminated the Rochester and White Plains proportion of the central administrative expenses of the company.

Petitioner argues that the total " joint office " and administrative expenses continued on into 1959 in spite of the elimination of Rochester and White Plains and that those expenses will be necessary to proper maintenance of service in the five districts. For example, it contends that although the services of an engineer were needed for the whole system while Rochester and White Plains were served, the need for the engineer to service the remaining five districts continues.

The total of the central administrative expenses for the system in 1958, denominated by petitioner as " joint office expenses " was $383,893. Petitioner concedes that in 1958 its Rochester plant " absorbed " $133,804 and its White Plains plant " absorbed " $10,279 of this sum, or an aggregate of 39.59% of the entire joint office expense.

Petitioner would reduce the 1958 expense by $34,390 for 1959; but the commission has made a further reduction in a total amount of $145,300 more than the petitioner thinks should be eliminated but giving allowance to factors such as wage increases which need not be examined now in detail. This total reduction in joint office expenses by the commission in reaching the 1959 operating expense is approximately the effect of eliminating entirely the ratio to the total that the Rochester and White Plains plants incurred or " absorbed " in this area of general expense.

We recognize, of course, that there is probably an irreducible minimum in general expenses of a public utility system and that the elimination of one or two units might not necessarily reduce total general expenses in the exact ratio that the units bear to the whole system. On the other hand it is clear from the record before us that some of the expenses in the Rochester plant, for example, those in 1959 related to the winding up and the adjustment between the petitioner and the public authority which had taken over that plant are remote from service to consumers. The costs of managing and implementing the plant turnover and the complex billing and other adjustments have no apparent bearing on the cost of service to water buyers in remote areas such as Glen Cove in Long Island.

The company's witness stated that although the Rochester plant had accounted for about one third of the company's total

water business he could see "no appreciable reduction" of such expenses in 1959 even after the company no longer owned or operated the plant and that as late as June, 1959 the accounting work in relation to this plant was still going on in the central office of the company.

It seems reasonable to think, as the commission has concluded, that some of the accounting work which petitioner seeks to charge as utility operating expense is for adjustments with the public authority which has taken over the Rochester plant; and that these charges ought not to be borne in any part by the users of water services elsewhere.

Between 1951 and 1959 very substantial parts of petitioner's properties that had been used for utility services were condemned and sold. About two thirds of the company's utility properties went through this process. Petitioner received about $29,000,000 for these properties which had cost it about $14,000,-000. About 67% of the petitioner's investments are now in nonutility areas.

The management and reinvestment of these proceeds not only effected important changes in the character of petitioner's business but, indeed, made the actual performance of public utility service the lesser part of its function. The commission argues that "the co-mingling of the company's utility and nonutility business leads and has led to overloading the consuming public — the ratepayers — with portions of the joint office expense which are attributable to the private, nonutility business of the company and its stockholders". The salaries of the staff of petitioner's president were charged entirely to the utility operation together with almost all the rent of the New York office of the company.

These and other factors, as well as the attribution in 1959 of the 1958 expenses of the discontinued plants led the commission to make the deduction in office expenses of which petitioner complains. We are of opinion the commission was entirely warranted in eliminating $145,300 from expenses in evaluating the allowable total thereof.

The determination of the commission was made in October, 1959 and proof before it was the actual experience of the company in the previously fully completed year 1958, and the experience of the company to August 1, 1959. Beyond that the data in 1959 were based on estimates.

The commission considered the 1959 year end as the appropriate time at which the proof entering into the rates to be charged would be considered. This, of course, includes some estimates (those beyond Aug. 1, 1959), but the commission

considered those as well as the 1958 and 1959 actual experience in reaching its determination. The company contends that further estimates of operations extending to July 1, 1960 should be weighed into consideration, and argues that both because of inflationary trends and the intended improvements and other expenses suggested by the exhibit indicating future operations, a higher base would be found with a substantially larger increase in rates.

The commission argues that although it considered and reflected in its decision projection to the 1959 year end, it was not required to extend this projection to July 31, 1960, which would have amounted to an entire year of theoretical projections; and that it was a safer and more reliable practice to weigh into consideration the actual 1958 and 1959 experience of the company with a limited 1959 projection than to take the company's alternative. We see no error of law in this part of the decision. Although petitioner correctly argues that in *Matter of New York Tel. Co.* (20 P. U. R. [3d ed.] 129) the commission allowed a telephone company to make such projections, we would not impose such a policy invariably on the commission as a matter of judicial compulsion. This is a matter of degree and the projection to the year end 1959 seems a reasonable limitation.

Essentially this is a way of weighing and evaluating facts and future projections of theoretical expenses may not always have the same reliability and do not necessarily follow invariably from one kind of utility to another or from one company to another engaged in a similar utility enterprise. There is some force, it seems to us, in the commission's view that the 1960 figures are estimates based on estimates and the company is not necessarily right in predicting — for rate-making at least — the exact trend of future inflation.

We turn now to a problem created by a Federal tax election made by petitioner. In order to avoid paying a Federal capital gains tax on a portion of the proceeds resulting from the condemnation of its property, petitioner elected to consider that some of the resulting proceeds were reinvested in the utility's plant. Section 1033 of the Internal Revenue Code permits non-recognition of capital gains under circumstances in which the gains are deemed reinvested in similar property. But when property purchased in this way is depreciated thereafter, it must be depreciated for Federal tax purposes on the cost of the original property.

In petitioner's case this resulted in paying about $60,000 higher Federal tax than if the new property had been bought

and depreciated in the usual way and this amount was disallowed by the commission in fixing the tax base. The practice is, as has been pointed out, allowed by Federal law. The commission is of opinion that the tax procedure was elected by petitioner to save itself capital gains tax in an area of no value to the consumers of its water; but merely to relieve its stockholders of paying a higher Federal tax, or to defer the time of payment.

On the election thus favorable to itself, made in its character as an investing or holding company, the petitioner in effect is passing an unfavorable end result — a higher tax — on to its consumers. Fresh capital, of course, would win a full depreciation at cost, which would be reflected in the tax base; but this is not fresh capital; this is capital drafted into the utility area with a special tax advantage of no value whatever to the utility consumer. We are aware that cogent arguments can be made the other way; that it is the practice of the commission to follow the actual tax practices of utilities approved by the Federal and State Governments, but in the end the practice is debatable; it is not exactly like some of the procedures which have been sanctioned by the commission; and in saying this we conclude that the determination is in this respect neither so arbitrary nor so wrong as a matter of law to require judicial interference.

We agree with the commission also in disallowing as part of the operating expenses the payment of $35,000 taxes which resulted because of an election by the petitioner not to claim for rate case purposes tax deductions on sinking fund debentures interest in the sum of about $70,000. These debentures, it seems to us, are sufficiently related to the utility property and business, and a lien on its assets, to indicate that they should be included as a tax deduction in respect of such business.

The debentures were issued to refinance mortgage bonds secured by utility property, and it is not disputed that in the 1957 rate case the interest was not excluded by the company; and it is apparent that income from water properties provides the primary source of interest payments. A witness for the company conceded that in the event of dissolution of the company if the net water plant was worth more than the principal amount of mortgage indebtedness, the remaining " utility assets " of the company would be available to the " debenture bond holders ".

In 1958 the petitioner spent $76,000 in legal fees in defense of litigation instituted by dissatisfied stockholders; and this has been disallowed by the commission as an expense to be weighed into the rate calculation. Although it is a usual practice to allow such expenses arising from the internal management of utility

companies, the commission argues here that the dispute with stockholders had no important bearing on the management of the utility part of the business, but was concerned with a desire on the part of the complaining stockholders to obtain a distribution of the substantial gains which had resulted from the condemnation and sale of the company's property.

While this involved, as the petitioner argues, a corporate controversy, it did not involve a corporate controversy relating to utility service, but rather to the distribution of nonutility profits. The commission was warranted, in our view, in excluding these charges from the rate computations.

In 1951 petitioner sold land which had been used as a storage reservoir for the Woodhaven district because it was no longer deemed useful in the service. It had cost $41,336 and was sold at a net profit of $270,554. In 1953 and in subsequent years the commission ruled that in fixing rates the petitioner's returns should be reduced by about 1/17th of such profit ($15,900) annually over a period of 17 years. In this proceeding the commission has followed its own prior rulings which had been accepted by the petitioner, which now contests the basic (1953) determination as reflected in the current decision.

The uniform system of accounts approved by the commission applicable to water companies in dealing with land used for utility purposes allows land sold at a loss to be debited to the depreciation reserve and thus increase the rate base. If land is sold at a profit, it is required that the profit be added to, i.e., " credited to ", the depreciation reserve, so that there is a corresponding reduction of the rate base and resulting return. The utility is thus protected from a loss in the sale of land in its operations; it seems reasonable it should pass on a profit to the consumer. (*Matter of Plainfield-Union Water Co.*, 57 N. J. Super. 158; cf. *Minneapolis St. Ry. Co.* v. *City of Minneapolis*, 251 Minn. 43.)

The commission also disapproved as operating expenses, to be reflected in the rate computations, legal fees in the sum of $50,226.98 incurred in connection with a note issue plan which the commission had refused to approve. Essentially the petitioner sought to issue notes to retire portions of its stock held by minority stockholders. These stockholders objected to retention of profits from sale of assets. The basis of the commission's disapproval was that it would involve the pledge of utility credit for nonutility purposes. (See Public Service Law, § 89-f; *Matter of Brooklyn Union Gas Co.* v. *Public Service Comm.*, 8 A D 2d 210, affd. 8 N Y 2d 815.) The commission has ruled that the proposed note issue and the expenses to which it gave rise

related to the manner of distribution of cash from the company-accumulated funds and ought not be passed on to the water consumers. We are of opinion this issue was correctly determined.

In disallowing the expense claim of $9,000 for excess dividend tax payable to the State of New York as part of the operating expense calculation the commission was of opinion it was not a part of the costs of furnishing water, as the commission has held in prior cases, e.g., *Kings County Lighting Co. Rates* (Case 6983, 1937). In any event, part of this claim was based on a recoupment of taxes levied for prior years, which the commission argues should not be imposed on future consumers; and there are offsets which in any event, in the commission's submission to this court, render the issue *de minimis*.

The determination of the commission should be confirmed, with $50 costs.

Petitioner's motion for a stay should be denied, without costs.

COON, GIBSON, HERLIHY and REYNOLDS, JJ., concur.

Determination of the commission confirmed, with $50 costs. Petitioner's motion for a stay denied, without costs.