MINNESOTA POWER & LIGHT COM-
PANY, Petitioner, Appellant,

v.

MINNESOTA PUBLIC SERVICE
COMMISSION, Respondent.

BUTLER TACONITE PROJECT, et al.,
Intervenors, Appellants,

v.

MINNESOTA PUBLIC SERVICE
COMMISSION, Respondent.

HIBBING TACONITE CO., a joint
venture, Appellant,

v.

MINNESOTA PUBLIC SERVICE
COMMISSION, Respondent.

(Other Parties Involved in These
Appeals are as Follows:)

Potlach Corporation,
Intervenor-Respondent,

Office of Consumer Service, Respondent,

Conwed Corporation, et al.,
Intervenors-Respondents.

Nos. 51475, 51554, 51585 and 51760.

Supreme Court of Minnesota.

Oct. 9, 1981.

Briggs & Morgan, Samuel L. Hanson and Scott Davies, Minneapolis, James R. Habicht, Duluth, for Minnesota Power & Light Co.

Levitt, Palmer, Bowen, Rotman & Share, and Robert G. Share, Minneapolis, Steer, Strauss, White & Tobias and James J. Ryan, Cincinnati, Ohio, David A. Kuhn, Stuart H. Theis, Hanna Mining Company, Cleveland, Ohio, for Butler Taconite Project et al.

Mackall, Crounse & Moore and Robert S. Lee, Minneapolis, Pickands Mather & Co., and Frank Hartman, Asst. Gen. Counsel, Cleveland, Ohio, for Hibbing Taconite Co.

Warren Spannaus, Atty. Gen., Jean Heilman, Asst. Atty. Gen., Rodney Wilson and Kenneth Nickolai, Sp. Asst. Attys. Gen., St. Paul, for Minn. Public Service Comm.

Warren Spannaus, Atty. Gen., Peter H. Grills and Alan I. Gilbert, Sp. Asst. Attys. Gen., St. Paul, for Office of Consumer Services.

Lindquist & Vennum and Richard A. Primuth, Minneapolis, for Potlatch Corp.

Wurst, Carroll & Pearson and James D. Larson, Minneapolis, for Conwed Corp. et al.

OTIS, Justice.

These consolidated appeals are from the order and judgment of the district court affirming the decision of the Public Service Commission (PSC) to grant an increase in electric rates to Minnesota Power and Light Company (MPL) for the 1978 test year.[1]

MPL is an investor-owned public utility engaged in the generation and sale of electric energy in central and northeast Minnesota. MPL serves approximately 92,000 customers which are classified in the following categories: (1) residential; (2) general service; (3) large light and power; (4) large power; (5) municipal; and (6) lighting. A unique aspect of MPL's business is the predominance of industrial sales, which account for approximately 66 percent of the company's total revenues.

During the mid-seventies, MPL undertook a large construction program to accomodate the projected growth in large power class, which is dominated by the taconite industry. This construction program represented the largest percentage growth in plant of any utility in the United States for the period from 1978 to 1980. At the time of the hearing, a 500 megawatt generating unit known as Clay Boswell No. 4 was being constructed near Cohasset, Minnesota, for service in May 1980. MPL was also planning to construct an additional generating facility known as Floodwood-Fine Lakes for service in 1986.

The various appellants present the following issues for review:

1. Did the trial court err in affirming the PSC's determination of the rate of return on common equity?

2. Did the trial court err in affirming the PSC's decision to allow MPL to earn a current return on a portion of its construction work in progress funds?

3. Did the trial court err in affirming the PSC's allocation of rates?

4. Did the trial court err in affirming the PSC's decision to set the effective federal corporate tax rate at 46 percent?

We affirm.

Rate of Return on Common Equity

The rate of return on common equity is a component of the overall rate of return a utility is granted.[2] A utility is entitled to a fair rate of return which we have defined as one which "will provide earnings to investors comparable to those realized in other businesses which are attended by similar risks, will allow the company to attract new capital as required, and will maintain the company's financial integrity * * *." *Northwestern Bell Telephone Co. v. State*, 299 Minn. 1, 5, 216 N.W.2d 841, 846 (1974). Complex methodologies have been developed by economists to ascertain a rate of return on common equity which meets these standards, one of which is the discounted cash flow analysis.

Three witnesses, Simmons, Miller and Fraser, gave primary testimony[3] on what the fair rate of return on common equity should be for MPL. In making its determination on the rate of return on common equity, the PSC initially summarized the direct, cross-examination and rebuttal testimony presented. Under the heading "Commission's Conclusions on Cost of Equity" the PSC announced it would follow the *North Central* doctrine[4] in reviewing the

---

1. The test year began on July 1, 1978 and closed on June 30, 1979.

2. The overall rate of return is comprised of four elements, the rate of return on: short-term debt; long-term debt; preferred stock; and common stock.

3. MPL witness Sandbulte gave testimony supporting Fraser's recommendation on the fair rate of return on common equity.

4. The *North Central* doctrine is a methodology of reviewing expert testimony on rate of return

on common equity which was adopted by the PSC in *In re Petition of North Central Public Service Company*, No. G–101/GR–77–221 (Minn.Pub.Serv. Comm'n Dec. 30, 1977). The PSC enunciated the doctrine as follows:

Fixing the rate of return on common equity is a legislative process. In the ideal sense the Commission's obligation is to insure that a Company has the opportunity to earn as much as it needs to maintain its financial integrity and provide adequate service and not a penny more. In exercising its mandate to protect the public interest, we believe that

expert testimony presented on the rate of return on common equity.

The PSC first focused its attention upon Simmons' testimony. Simmons recommended the lowest rate of return on common equity. The PSC concluded its discussion of Simmons' testimony by stating: "Thus, under the *North Central* test, we feel that Simmons' testimony did not withstand cross-examination." The PSC, therefore, rejected Simmons' recommendation. The PSC next analyzed Miller's testimony. Miller's recommendation was the second lowest presented to the PSC. The PSC adopted Miller's recommendation, which was predicted on discounted cash flow analysis, with some alterations based upon rebuttal testimony. The PSC allowed a 13 percent return on common equity. There is no indication in the PSC's decision that it analyzed the testimony concerning the 13.75 percent rate of return on common equity recommended by MPL's witness, Fraser.

On appeal MPL claims: first, the PSC applied the *North Central* doctrine in determining the rate of return on common equity and use of the doctrine is reversible error; second, the PSC's reliance on the discounted cash flow analysis to determine the rate of return on common equity was error because the validity of the discounted cash flow analysis was not supported by substantial evidence; and finally, a 13 percent rate of return on common equity is confiscatory.

█ The *North Central* doctrine is a method of reviewing expert testimony on rate of return on common equity which requires the lowest recommendation, which is within the range of reasonableness, to be considered first. If the testimony supporting the lowest recommended rate of return

on common equity survives cross-examination and rebuttal testimony or can be adjusted to correct its deficiencies, the PSC will adopt the recommendation. This process continues until the PSC finds a recommendation which has survived challenge or can be corrected.[5]

In *Hibbing Taconite Co. v. Minnesota Public Service Commission*, 302 N.W.2d 5, 11 (Minn.1980) we held the use of the *North Central* doctrine is impermissible. We stated:

> [T]his policy is no doubt designed to comply with the statutory requirement that the PSC ensure that utility rates are just and reasonable and that "[a]ny doubt as to the reasonableness should be resolved in favor of the consumer." Minn.Stat. § 216B.03 (1978). The *North Central* doctrine is, however, not an adequate method to achieve that goal. Chapter 216B gives to the PSC the duty as well as the power to set a just and reasonable rate after a full review of evidence and testimony. To peg an established rate to a rate advocated by any one of several expert witnesses is an arbitrary delegation of that duty.

Our review of the *Hibbing Taconite* record convinced us that the PSC did not apply the *North Central* doctrine, despite its announcement that it was following the doctrine. We, therefore, did not reverse on that ground.

In this case, it is clear the *North Central* doctrine was applied. The contention that the PSC's detailed summary of the testimony offered on rate of return on common equity demonstrates PSC did not apply the doctrine is without merit. A recitation of the testimony presented is not a substitute for findings and conclusions by the PSC.

we should choose the lowest acceptable recommendation (adjusted as appropriate) which falls within the range of reasonableness. We will first review the testimony of all the witnesses to determine a range of reasonableness. We will then focus on the testimony of the witness who recommends the lowest rate of return to determine if it is reasonable and has withstood the tests of cross examination and rebuttal testimony. If

we are satisfied that it is sound, we will adopt it. If the testimony has been shown to be deficient in certain respects, but is nevertheless basically sound, we will adjust it to remedy the deficiencies and adopt it as adjusted. If we conclude that the testimony is basically unsound, we will reject it and consider the next lowest recommendation, etc.

**5.** See n. 4, *supra.*

■ We are not persuaded the PSC's application of the *North Central* doctrine is, in this case, sufficiently prejudicial to require reversal.[6] In our opinion, the PSC's decision to allow a current return on a portion of construction work in progress funds, which generated an increase of over 15 million dollars, corrected any injustices which may have resulted from the PSC's application of the *North Central* doctrine.[7]

■ MPL next argues that the PSC erred in relying on the discounted cash flow analysis performed by witness Miller to determine the rate of return on common equity because the validity of the discounted cash flow analysis was not supported by substantial evidence. We are not unmindful of the seriousness of MPL's attacks on the validity of the discounted cash flow method as performed by witness Miller. We are not convinced, however, that the PSC erred by basing its determination of the rate of return on common equity on the discounted cash flow analysis performed by witness Miller.

■ MPL's final contention is that the 13 percent rate of return on common equity is confiscatory. This court has followed the principles enunciated by the United States Supreme Court in *Bluefield Water Works & Improvement Co. v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) to determine if the rate of return on common equity is confiscatory.

With regard to rate of return on common equity the Supreme Court stated:

What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

*Id.* at 692–93, 43 S.Ct. at 679.

MPL has not shown the 13 percent rate of return coupled with the current return on construction work in progress fails to assure investor confidence in the financial soundness of MPL or prohibits MPL from maintaining its credit and raising necessary funds. In light of the current return al-

---

6. We had not issued our opinion in *Hibbing Taconite* at the time the PSC and the district court considered this case. Use of the North Central doctrine subsequent to our opinion in *Hibbing Taconite* is reversible error.

7. MPL agrees that the current return on construction work in progress funds lowers the cost of equity from what it would have been without this relief. MPL notes, however, that the 13 percent rate of return on common equity coupled with the current return on construction work in progress funds leaves its financial position worse or at least no better than, the financial position in the 1977 test year. The financial indicators cited by MPL to support the contention are: allowance for funds used during construction as a percentage of earnings; construction work in progress as a percentage of the rate base and coverage. MPL reasons since we determined a 13 percent rate of return

on common equity was not supported by substantial evidence in *Hibbing Taconite*, this court's review of the PSC's decision granting a rate increase to MPL for the 1977 test year, it would be inconsistent to conclude the current return on construction work in progress is sufficient to correct the 13 percent rate of return on common equity allowed by the PSC. We are not persuaded by this argument. Our decision in *Hibbing Taconite* was not grounded on the fact that allowance for funds used during construction as a percentage of earnings and construction work in progress funds as a percentage of the rate base were too high or that coverage was insufficient. Further, to accept MPL's contention we would have to assume the evidence presented in the *Hibbing Taconite* case was the same as presented herein. We are unwilling to make this assumption.

lowed on construction work in progress funds, we conclude the 13 percent rate of return on common equity was not confiscatory.

**Current Return on Construction Work in Progress Funds**

Construction Work in Progress (CWIP) represents the amount of money committed to plant and equipment under construction. Traditionally, a utility has not been allowed to recover the cost of capital required in the construction period until the plant goes into service. The rationale for this policy is that current ratepayers should not pay for the cost of investments which are not used by or useful to current ratepayers. The following accounting principles are observed to implement this policy.

To the extent CWIP is included in the rate base, an addition to income is made. The addition is known as "Allowance for Funds used During Construction" (AFDC). AFDC is treated as if it were actual income. The effect of this bookkeeping entry is to increase the company's income for rate-making purposes thereby limiting an increase of rates. 1 A.J.G. Priest, *Principles of Public Utility Regulation, Theory and Application* 178 (1969). AFDC income is accumulated, that is, capitalized, until the plant goes into service at which time it is added to the rate base.[8]

Minn.Stat. § 216B.16, subd. 6a (1980)[9] allows the PSC to include CWIP in the rate base without a credit to AFDC, that is to eliminate AFDC on a portion of CWIP. In this case, the PSC allowed MPL to eliminate AFDC on 50 percent of the qualifying CWIP for Clay Boswell No. 4.[10] The increase resulting from this decision is over 15 million dollars.

The appellants, excepting MPL, challenge the PSC decision to eliminate AFDC on 50 percent of the qualifying CWIP for Clay Boswell No. 4, insofar as the particular amount of CWIP which was allowed to be included in the rate base without a credit to AFDC, on two grounds. The appellants contend that the PSC failed to set forth the factual basis to justify its decision and its decision was not supported by substantial evidence.

We agree that the PSC failed to articulate the facts which justify eliminating AFDC on 50 percent of the qualifying CWIP for Clay Boswell No. 4 as opposed to a greater or lesser amount. However, no useful purpose would be served by remanding this case to require the PSC to delineate the facts supporting its decision since we conclude that the decision was supported by substantial evidence.

> To the extent that construction work in progress is included in the rate base, the commission shall determine in its discretion whether and to what extent the income used in determining the actual return on the public utility property shall include an allowance for funds used during construction, considering the following factors:
>
>   (a) The magnitude of the construction work in progress as a percentage of the net investment rate base;
>
>   (b) The impact on cash flow and the utility's capital costs;
>
>   (c) The effect on consumer rates;
>
>   (d) Whether it confers a present benefit upon an identifiable class or classes of customers; and
>
>   (e) Whether it is of a short term nature or will be imminently useful in the provision of utility service.

**8.** The PSC explained AFDC and CWIP as follows:

> Suffice it to say in simplified form that by capitalizing AFDC, a utility does not realize an effective current return on CWIP, such return being delayed until the CWIP in question actually becomes used and useful in producing electricity [the plant and equipment under construction goes into service]. Discontinuation of the capitalization of AFDC would, on the other hand, allow a current return on CWIP in the rate base. Although the income statement may appear the same in both instances, the reported income in the latter case will be in real money whereas in the former case reported income is merely a bookkeeping entry to the extent that AFDC is capitalized. *In re Petition of Minn. Power & Light Co.*, No. E–015/GR–78–514, 22–23 (Minn.Pub.Serv. Comm'n April 9, 1979) reprinted in Joint Appendix for Appellants and Respondent at 120.

**9.** Minn.Stat. § 216B.16, subd. 6a (1980) provides:

**10.** When the CWIP on Clay Boswell equals $284,988,500, MPL must capitalize AFDC any project amounts of CWIP for Clay Boswell No. 4 in excess of $215,650,800.

Rate Allocation

■ The PSC allocated the increase resulting from the elimination of AFDC on 50 percent of the qualifying CWIP on Clay Boswell No. 4 to the large power class for the following reasons:

The evidence has shown that the amount of CWIP as a percentage of the rate base is extremely high at this time and for the short term future. This phenomenon has had a negative impact on the Company's cash flow and its costs of capital. The Commission has resolved as a *temporary* and *emergency* matter in this case, [to] include a portion of the AFDC as cash earnings. The Commission recognizes that the inclusion of this cash AFDC, even on the short term basis for which the Company proposes will have an adverse impact on consumer rates. Therefore, the Commission concludes that such costs be assigned only to such class or classes of customers as are deriving a present benefit from the construction work underway. Only one class meets that description. Upon the evidence of this case and the two preceding it, it has been uncontrovertibly demonstrated that the large power class, comprised in substantial part by the taconite industry, requires this construction in order that it may expand its operations in Minnesota. Without MP&L's assuming the obligation to provide this power, the industry would have to build plant equivalent in capacity to Clay Boswell No. 4.

The fact that MP&L, a regulated utility, is required as a condition of its monopoly status to provide service to all who request it should not be allowed to obscure the reality that the large power class derives a current and significant benefit from the *assurance* of adequate and reliable power to meet its needs in the future * * *.

The Commission concludes that this allocation of responsibility for cash AFDC fulfills the meaning and intent of the statute and that it resolves the problems of the cost of service study deficiencies which allocate responsibilities too heavily to the other classes.

*In re Petition of Minnesota Power & Light Co.,* No. E–015/GR–78–514, 72 (Minn.Pub. Serv. Comm'n April 9, 1979) (emphasis in original) *reprinted in* Joint Appendix for Appellants and Respondent at 198–99.

We defined the scope of review of the PSC's rate design decisions in *Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5 (Minn.1980) as follows: "When the PSC allocates rates among classes of customers, it acts in a legislative capacity and the courts will uphold the PSC's decision unless it exceeds the PSC's statutory authority or results in unjust, unreasonable, or discriminatory rates by clear and convincing evidence." *Id.* at 9; *e. g., St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977).

The appellants, excepting MPL, assert that the proper scope of review of the adjudicative findings of fact upon which the PSC bases, in part, its determination of the proper rate allocation should be substantial evidence. We do not agree.

The appellants, excepting MPL, assert the PSC's decision to allocate the increase resulting from the elimination of AFDC on 50 percent of the CWIP for Clay Boswell is unjust, unreasonable, and discriminatory because: the large power class is held responsible for the entire burden of eliminating AFDC on CWIP when it was only responsible for 78 percent of the growth of the system; the large power class generates 70 percent of MPL's revenues yet demands only 65 percent of the system's power; and the record does not indicate that correction of the deficiencies in the cost of service study would result in increased cost of servicing the large power class.

While we might have allocated the cost of eliminating AFDC on 50 percent of the qualifying CWIP for Clay Boswell No. 4 in proportion to the percentage of growth in each class, the PSC's decision to allocate the cost solely to the large power class was not arbitrary. The PSC's conclusion that the magnitude of MPL's construction program,

which was due to the construction of Clay Boswell No. 4, adversely affected MPL's financial health and necessitated the extraordinary relief granted was well-founded in the record. It is also clear that but for the growth of the large power class' demand for energy, Clay Boswell No. 4 would not have been constructed for service in May 1980. In light of these facts, the PSC's decision was reasonable.

The 5 percent difference between the revenue contribution and the energy demand made by the large power class is, in our opinion, not significant. We do agree that the PSC's conclusion that correction of the deficiencies in the loss of service study would justify allocating the 15 million dollar cost of eliminating AFDC on 50 percent of the qualifying CWIP for Clay Boswell No. 4 was without any support and were this the only basis for the PSC's decision, we would reverse.

Federal Corporate Tax Rate

■ MPL's petition for a rate increase was based upon a projected test year of July 1, 1978, through June 30, 1979. The 1978 Revenue Act lowered the federal corporate tax rate from 48 percent to 46 percent as of January 1, 1979. The PSC set the effective federal corporate tax rate at 46 percent and made no adjustment to account for the higher tax rate during the first six months of the test year. MPL asserts that the PSC's failure to provide for the higher tax rate was error. We agree.

The PSC must endeavor to adequately account for a utility's tax liability. *See Northwestern Bell Telephone Co. v. State*, 253 N.W.2d 815, 821 (Minn.1977). Its failure to do so in this case is error. While MPL's underrecovery of tax expense was not insubstantial, we are not convinced that it is of sufficient magnitude to require reversal.

Affirmed.

SHERAN, C. J., took no part in the consideration or decision of this case.