**BUTLER TACONITE PROJECT, et al., Appellants,**

v.

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent.**

No. C8-82-977.

Supreme Court of Minnesota.

April 22, 1983.

Rehearing Denied May 17, 1983.

Levitt, Palmer, Bowen, Rotman & Share and Robert G. Share, Minneapolis, Steer, Strauss, White & Tobias and James J. Ryan, Cincinnati, Ohio, for appellants; David S. Baumgartner, The Hanna Mining Co., David A. Kuhn, Oglebay Norton Co., Cleveland, Ohio, of counsel.

Hubert H. Humphrey, III, Atty. Gen., and James T. Jarvis, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Public Utilities Comn.

Briggs & Morgan, Samuel L. Hanson and R. Scott Davies, Minneapolis, James R. Habicht, Duluth, for Minnesota Power & Light Co.

Lindquist & Vennum, Laurance R. Waldoch and Daniel J. Sheran, Minneapolis, for Potlatch Corp.

Wurst, Pearson, Hamilton, Larson & Underwood and James D. Larson, Minneapolis, for Conwed Corp., et al.

John C. Bjork, Sp. Asst. Atty. Gen., St. Paul, for Office of Consumer Service of the Minnesota Dept. of Commerce.

COYNE, Justice.

For the third time in recent years we review a decision of the Minnesota Public Utilities Commission (PUC), formerly Minnesota Public Services Commission, granting Minnesota Power & Light Company (MPL) an increase in electric rates. In large measure all three proceedings were prompted by the costs incurred by MPL in the construction of a generating plant

known as Clay Boswell No. 4. This appeal by three members of the taconite industry, which dominate the large power class of MPL customers, is from the district court's order for judgment affirming the decision of the PUC granting an increase in electric rates effective May 1, 1980.

We affirm.

The circumstances giving rise to the construction of Clay Boswell No. 4 and the impact of that construction on MPL's cash flow and bond rating have been outlined in our earlier decisions, *Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5 (Minn.1980), and *Minnesota Power and Light Company v. Minnesota Public Service Commission,* 310 N.W.2d 686 (Minn.1981). It suffices here to say that Minn.Stat. § 216B.16, subd. 6, directs the PUC, in the exercise of its power to determine public utility rates, to consider both the public need for adequate, efficient, and reasonable service and the public utility's need for revenue sufficient (a) to enable it to meet the cost of furnishing the service, including adequate provision for depreciation of the property "used and useful" in rendering the service, and (b) to earn a fair and reasonable rate of return upon the investment in such property. Traditionally, a return on a public utility's investment in new construction has been deferred until the new plant goes into service so that the rates assessed current ratepayers provide a return only with respect to property from which the ratepayers derive current benefit.

Postponement of the return is achieved through accounting devices prescribed by statute and regulations: to the extent construction work in progress (CWIP) is included in the rate base, an allowance for funds used during construction (AFDC)—an amount equivalent to the financing or carrying cost of the funds used for construction purposes—is treated as if it were income for purposes of determining the public utility's return on its property. Thus, the AFDC imputed income offsets the current return on the property during the construction period. When the construction is completed and the new plant goes into service, the capitalized AFDC becomes part of the rate base and the rates will include a return on the total investment, including AFDC, during the useful life of the plant.

Until 1977 this traditional treatment of AFDC was mandated by statute.[1] Following the 1977 amendment of Minn.Stat. § 216B.16,[2] MPL sought to alleviate its cash flow problems by requesting a rate increase based in part on the inclusion in its rate base of the CWIP associated with Clay Boswell No. 4 without a concomitant offset by the inclusion of AFDC as income. The PUC concluded that the circumstances did not require a departure from the traditional method of treating AFDC, and we affirmed that decision in *Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5 (Minn.1980).

In 1978 MPL renewed its petition for authorization to discontinue in part the cap-

1. Minn.Stat. § 216B.16, subd. 6 (1976), required the imputation of AFDC as income:

   To the extent that construction work in progress is included in the rate base, the income used in determining the actual return on the public utility property shall include an allowance for funds used during construction.

2. Act of June 2, 1977, ch. 359, §§ 3 & 4, 1977 Minn.Laws 772, 773–74, repealed the portion of § 216B.16, subd. 6, set out at footnote 1, *supra,* and authorized the PUC to exercise its discretion in determining whether and to what extent AFDC should be utilized to preclude a current return on construction work in progress (Minn. Stat. § 216B.16, subd. 6a [1982]):

   To the extent that construction work in progress is included in the rate base, the

commission shall determine in its discretion whether and to what extent the income used in determining the actual return on the public utility property shall include an allowance for funds used during construction, considering the following factors:

(a) The magnitude of the construction work in progress as a percentage of the net investment rate base;

(b) The impact on cash flow and the utility's capital costs;

(c) The effect on consumer rates;

(d) Whether it confers a present benefit upon an identifiable class or classes of customers; and

(e) Whether it is of a short term nature or will be imminently useful in the provision of utility service.

italization of AFDC. The several intervenors, one of whom was Butler Taconite Project (an appellant in the present case), proposed that MPL be required to adhere to the traditional practice of fully capitalizing AFDC. The PUC concluded that the magnitude of the construction project and the resultant adverse effect on MPL's cash flow and cost of capital justified extraordinary relief. Having found that permitting MPL to realize a current return on any portion of the construction work in progress would have an adverse impact on consumer rates, the PUC determined that it was imperative that the increase in rates attributable to such relief should be assigned only to the class of customers deriving a present benefit from the construction program—*i.e.,* the large power class. The PUC directed that one-half of the interest on the construction work in progress should be capitalized and allocated to all classes through traditional AFDC treatment and that the remaining half should be recovered immediately as a current expense through a rate increase assigned to the large power class. We affirmed that decision in *Minnesota Power & Light Company v. Minnesota Public Service Commission,* 310 N.W.2d 686 (Minn.1981).

On February 1, 1980, in anticipation of placing Clay Boswell in service on April 1st, MPL petitioned for a rate increase to be effective May 1, 1980. On January 30, 1981, the PUC issued its decision permitting MPL to implement rate increases effective May 1, 1980. Clay Boswell No. 4 is included in the rate base for the 1980 test year as plant in service. To put it simply, then, the 1980 rates provide a return on MPL's aggregate investment comprising both the amount formerly described as Clay Boswell No. 4 construction work in progress and the capitalized portion (one-half) of AFDC. Accordingly, all consumer classes are paying their proportionate share of the return and expenses associated with Clay Boswell No. 4.

The appellants contend, however, that the rate base allocated to the large power class of which the appellants are members should have been credited with the full amount of their AFDC payments of approximately 12.1 million dollars made pursuant to the PUC's 1978 order. Essentially, appellants propose that MPL's accounting system for the prior two years be revised so that the uncapitalized portion of Clay Boswell No. 4 AFDC can be capitalized and added to the rate base, that the enlarged rate base be allocated proportionately among all consumer classes of ratepayers, and that the rate base allocated to the large power class be reduced by 12.1 million dollars. The practical effect of appellants' proposal would be to treat the payments required of the large power class under the 1978 order as an advance payment and to thrust higher rates upon the other consumer classes.

Noting that it was clear from the language of the 1978 order that the assignment to the large power class of 50% of the financing cost attributable to the construction of Clay Boswell No. 4—based on the PUC's finding of fact that prior to the completion of Clay Boswell No. 4 only the large power class enjoyed a present benefit from its construction—was intended to constitute a "permanent solution" to MPL's financial problems arising out of the construction project, the PUC declined to allow the appellants' requested credit. The district court affirmed the PUC's order in the 1980 proceeding.

■ We agree with the PUC and the district court that the 1980 order is in all respects consistent with the tenor of the 1978 order and with our decision in *Minnesota Power & Light Company v. Minnesota Public Service Commission,* 310 N.W.2d 686 (Minn.1981). The 1978 order directed (a) the capitalization of one-half of the interest on construction work in progress (AFDC) and allocation of that capitalized portion to all consumer classes through traditional AFDC treatment and (b) immediate recovery of the remaining one-half as a current expense through rates assigned to the large power class. The decision to discontinue capitalization of one-half of AFDC and to treat it as a current expense bespeaks a "permanent solution" (rather than a temporary expedient), and the PUC so character

ized it in its 1978 order. Moreover, the PUC assigned the rate increase to the large power class as current payment for a current benefit. Although we did not expressly declare in *Minnesota Power & Light Company, supra,* that the decision to permit MPL to earn a current return on a portion of its construction work in progress was a "permanent solution," implicit in our reference to the PUC's decision to allocate the cost of "eliminating" AFDC on 50% of the Clay Boswell No. 4 construction work in progress solely to the large power class is the recognition that it constituted a permanent elimination of that amount from the rate base. Accordingly, the matter is governed by our decision in *Minnesota Power & Light Company, supra,* and the appellants may not relitigate the issue here.

The appellants also contend that the PUC exceeded its authority in ordering the rate increase be effective May 1, 1980, only 89 days after the February 1, 1980, filing of MPL's petition. Minn.Stat. § 216B.16, subd. 1 (1980) contains the following pertinent provision:

> *Unless the Commission otherwise orders,* no public utility shall change any rate which has been duly established under this chapter, except after 90 days notice to the commission, which notice shall include statements of facts, expert opinions, substantiating documents, and exhibits, supporting the change requested, and further shall state the change proposed to be made in the rates then in force, and the time when the modified rates will go into effect.

(Emphasis added).[3]

Had the PUC not ordered otherwise, MPL's increased rates would have become effective on May 2, 1980, 90 days after the filing of its petition. The PUC, however, *did* order otherwise, its order implementing the new rates on and after May 1, 1980. That action was within its statutory authority and its discretion.

Affirmed.

3. Act of March 15, 1982, ch. 414, § 1, 1982 Minn.Laws 261 reduced the 90-day notice period to a 60-day period.