In the Matter of the Petition of INTERSTATE POWER COMPANY for Authority to Increase its Rates for Electric Service in Minnesota.

No. C9–87–1218.

Court of Appeals of Minnesota.

Dec. 15, 1987.
Review Denied Feb. 17, 1988.

Clement F. Springer, Jr., William D. Carstedt, Leslie Recht, Defrees and Fiske, Chicago, Ill., Ralph H. Peterson, Peterson, Chesterman, Erickson, Anderson & Hareid, P.A., Albert Lea, for relator Interstate Power Co.

Hubert H. Humphrey, III, Atty. Gen., Mary Jo Murray, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Dept. of Public Service.

Hubert H. Humphrey, III, Atty. Gen., Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Public Utilities Com'n.

Hubert H. Humphrey, III, Atty. Gen., Dennis D. Ahlers, Gary R. Cunningham, Sp. Asst. Attys. Gen., St. Paul, for the Office of Atty. Gen.

Heard, considered and decided by FORSBERG, P.J., and WOZNIAK and STONE,* JJ.

* Acting as judge of the Court of Appeals by ap-

## OPINION

FORSBERG, Judge.

On July 1, 1986, Relator Interstate Power Company ("Interstate") filed an application with the Minnesota Public Utilities Commission ("Commission") for an increase of $2,472,944 in its annual Minnesota electric rates. In August 1986, the Commission issued an interim rate order, allowing Interstate to collect $1,161,505, subject to refund upon the issuance of a final order.

In December 1986, an administrative law judge ("ALJ") conducted hearings on Interstate's proposed rates, and in March 1987, the ALJ issued his report recommending the allowance of increased annual revenues in the amount of $521,995.

Interstate, the Office of the Attorney General, and the Department of Public Service ("DPS") filed exceptions to the ALJ's report, and the matter was reviewed by the Commission. On May 1, 1987, the Commission issued its order, allowing Interstate a final annual rate increase of $373,817. The Commission denied petitions for reconsideration and rehearing, and Interstate appealed to this court, seeking an additional increase of $737,976. The Commission moved to strike portions of Interstate's brief, and we have considered that motion as part of our review. To the extent Interstate's allegations are unsupported by the record, they have been disregarded. We affirm in part, reverse in part and remand.

## FACTS

Interstate is an electric and gas utility which serves southern Minnesota and portions of Iowa and Illinois. Interstate's proposed rate increase included a request for rate base treatment and amortization of the costs incurred in one transmission project and two generation projects, which Interstate entered into with other companies, and which were later cancelled when circumstances changed. In its petition for rehearing and reconsideration before the Commission, Interstate withdrew its re-

pointment pursuant to Minn. Const. art. 6, § 2.

quest for rate base treatment of the unamortized cancelled plant expenses. Since these rate base issues were not raised in Interstate's application for rehearing, we have not considered them on appeal.[1]

*Carroll County Project.*

In the early 1970's, due to a forecasted deficiency in service for 1982, Interstate requested its engineering firm to study and recommend alternative methods of obtaining additional power. In 1973, Interstate signed a letter of intent with Commonwealth Edison Company ("Commonwealth") to build a joint nuclear generating facility in Carroll County, Illinois. The Iowa–Illinois Gas and Electric Company joined the project, and the three companies set up a trust arrangement for holding land titles. The parties signed a formal agreement in 1984, and Commonwealth was designated as the parties' agent.

By 1975, Commonwealth had acquired additional land, and the companies applied to the Illinois Commerce Commission for approval of their joint participation in the proposed Carroll County project, pursuant to Section 27 of the Illinois Public Utilities Act. In 1976, the Illinois Commission issued an order denying approval of the Section 27 application, and advising the companies that they should request a Certificate of Public Convenience and Necessity under Section 55 of the Iowa Public Utilities Act before reapplying for approval under Section 27. At the time, a Section 55 certificate was valid for two years.

Commonwealth never applied for a Section 55 certificate, because the Carroll County project never came within two years of commencing physical construction. Based on discussions with Commonwealth, Interstate believed that there was no point in applying for a certificate if it would run out before construction commenced.

Interstate subsequently engaged another engineering firm to evaluate Interstate's participation in the Carroll County project. The engineers recommended that Inter-

state stay in the project, but in 1979 they recommended that Interstate obtain a reduction in participation. Based upon this recommendation, the delays in the project, the denial of Section 27 approval, and a decision to participate in the Guthrie project discussed below, Interstate followed this recommendation and reduced its participation in the Carroll County project.

In September 1981, the companies filed a new Section 27 application with the Illinois Commission, arguing that an application for a Section 55 certificate would still be premature because they had no plans to commence construction within two years. The Section 27 application was again denied, and in December 1981, Commonwealth decided to postpone the Carroll County project until 1999 or 2000. Shortly thereafter, Interstate decided to withdraw from the Carroll County project.

The ALJ found that Interstate's decisions to participate in and withdraw from the Carroll County project were prudent, considering the circumstances at the time of those decisions, and recommended allowing amortization of expenses over five years and rate base treatment of unamortized expenses. The ALJ reasoned that much of Interstate's delay in withdrawing from the project was the result of the inevitable regulatory lag attendant upon the implementation of such a large project.

The Commission agreed that Interstate's original decision to invest was prudent, but found that all expenses after the "preliminary planning stage" were unnecessary. The Commission therefore disallowed amortization of all but preliminary planning expenses.

*Guthrie County Project.*

In 1979, based upon delays in the Carroll County project and peak load growth experienced in the 1970's, Interstate entered into a joint project with three Iowa utilities to build a coal-fired generating facility at Guthrie County, Iowa.

---

1. In its brief, Interstate addresses a portion of the Commission's order which concerns rate base treatment of the cancelled projects. Minn. Stat. § 216B.27, subd. 2 (1986) provides that a party's failure to raise an issue in an application for rehearing before the Commission prohibits that party from raising the issue on appeal to this court.

The ALJ found that Interstate's decision to participate in the Guthrie County project was reasonable and prudent, because Interstate was forecasting an annual peak load growth of approximately three percent at the time. The ALJ therefore allowed Interstate to amortize test year expenses for the project.

The Commission disagreed, concluding that Interstate's forecasting methods were not reasonable, and that Interstate's decision to join the Guthrie project, based upon these forecasting methods, was imprudent. The Commission found that an evident shift in the pattern of peak load growth had followed the oil embargo of 1973, and that Interstate's forecasting method of using historical peak loads to predict future peak loads had not taken into consideration factors such as conservation, which Interstate had acknowledged was occurring. The Commission concluded that Interstate should have changed its forecasting methods by 1979 to incorporate factors such as conservation.

*Allowance for Funds Used During Construction.*

In 1980, Interstate entered into a project, known as the "White–Eldorado project," which involved a transmission line to be jointly constructed and owned by Interstate and three other Iowa utilities. This project was also subsequently cancelled.

The Commission found that Interstate's decisions to participate in and withdraw from the White–Eldorado project were prudent, but disallowed amortization of interest characterized as allowance for funds used during construction (AFUDC) on the White–Eldorado project. The Commission also characterized the interest owed Commonwealth on the Carroll County project as AFUDC, and disallowed amortization. The Commission reasoned that because construction had never begun on the projects, AFUDC should not be allowed.

*Period of Amortization.*

Interstate sought amortization over five years for costs of the cancelled Carroll County and Guthrie County projects, and a three-year amortization period for the White–Eldorado project expenses. The Commission ordered a 10–year amortization of the Carroll County and White–Eldorado costs.[2] The Commission's reasoning may be summarized as follows:

1. 10–year amortization periods for cancelled plant costs have been adopted in other cases;

2. Interstate presented no evidence indicating that its 3 and 5–year amortization periods were more reasonable than the precedent of a 10–year period; and

3. The 3–year amortization period proposed by Interstate for the White–Eldorado project costs was "unreasonably short," and the costs were of the same nature as other costs for which Interstate had proposed a 5–year amortization period.

*Keokuk Iowa Coal Inventory.*

Interstate requested rate base treatment of a coal supply located at a transloader facility in Keokuk, Iowa.

The Keokuk, Iowa site, located on the Mississippi River, is used by Interstate to receive and store coal transported by train from a Wyoming mine. At the Keokuk site, the coal is transloaded onto barges for shipment up the Mississippi River to Interstate's generating station located at Lansing, Iowa. The distance between the Keokuk, Iowa transloading site and the Lansing generating station is approximately 300 miles by river. The Mississippi River is closed to barge travel during winter months, although deliveries by train from the Wyoming mine continue to the Keokuk site year round. Nevertheless, testimony by Interstate suggested that the Keokuk transloader was the best means of transporting coal to the Lansing plant.

The ALJ found that the coal at the Keokuk site is not available to the Lansing plant during the winter non-navigational season: approximately December–March of

**2.** Because the Commission found the Guthrie project imprudent, it disallowed recovery of all costs.

normal years. The ALJ concluded that fuel not reasonably available as inventory should not be included in rate base. Because it was necessary to ship the coal from Keokuk to the Lansing plant, the ALJ concluded that the coal at Keokuk was not reasonably available as inventory at the Lansing plant for rate base purposes.

The ALJ also noted that Interstate had proposed that an unnecessarily high fuel supply be considered as inventory for rate purposes. The ALJ determined that a 90–day average inventory system-wide would be reasonable. After removing the Keokuk coal supply from consideration as inventory, the ALJ concluded that $2,532,853 would be a reasonable 90–day fuel inventory to be allowed in Interstate's rate base.

The Commission agreed with the ALJ that the Keokuk coal was not reasonably available as inventory for the Lansing plant, and accepted the ALJ's determination that the appropriate level of at-plant coal inventory was a system-wide average of a 90–day supply. Neither the Commission nor the ALJ addressed Interstate's argument that the coal shipped from the Keokuk, Iowa site was part of a necessary transportation system, and therefore working capital.

*Keokuk Litigation Expenses.*

In approximately 1977, Interstate entered into a contract with the Orba–Johnson Transshipment Company for the transloading of coal from land to river at the Keokuk, Iowa site.

The transloading facility was constructed by Orba–Johnson pursuant to a "turnkey" arrangement, on land purchased from Iowa Gateway, Inc. Iowa Gateway reserved an option to repurchase the property under certain circumstances.

Shortly before construction of the transloader facility was completed, Iowa Gateway attempted, unsuccessfully, to exercise its option to repurchase. Thereafter, Iowa Gateway commenced a lawsuit against Interstate and Orba–Johnson. After the lawsuit was begun, Interstate agreed to indemnify Orba–Johnson for all legal costs stemming from that lawsuit.

Interstate requested that it be allowed to include unamortized litigation expenses associated with the lawsuit in its rate base, and to include $179,770 as operating expenses.

The ALJ noted that in a prior 1981 rate case, Interstate had attempted to recover these same litigation expenses; however, they had been denied because Interstate had been unable to demonstrate that its actions leading to the litigation were reasonable and in the interests of its ratepayers.[3] The ALJ noted, however, that by the time of the present rate case, all relevant legal issues in the lawsuit had been resolved in favor of Interstate.

The ALJ concluded that Interstate's agreement to indemnify Orba–Johnson for its legal expenses was reasonable, since construction of the Keokuk transloader had been nearly completed at the time the lawsuit was begun, and since the transloader was the only economically viable one available for supplying coal to the Lansing generating plant. The ALJ also explained that the provision of coal to the Lansing plant was an integral part of the provision of electric service to Interstate's ratepayers. The ALJ therefore allowed rate base and operating expense treatment of the Keokuk litigation expenses. In a discussion following its findings, the ALJ noted that the Iowa and Illinois Commissions had allowed the litigation expenses to be passed on to ratepayers, reasoning that the lawsuit was necessary to ensure continued coal delivery for the operating of a plant which benefited those ratepayers.

The Commission's conclusions in rejecting the ALJ's reasoning may be restated as follows:

(1) The record did not contain substantial evidence that the outcome of the lawsuit would jeopardize the supply of coal to the Lansing plant;

(2) The fact that Interstate did not own the transloader was relevant; and

---

**3.** The Commission in 1981 had recognized that Interstate could not discuss the court proceedings while in the process of litigation, but nevertheless had disallowed the litigation expenses.

(3) Interstate should not be allowed to recover expenses which were incurred prior to the test year, and which were not representative of test year expenses.

*Acquisition of Out-of-State Capacity.*

Interstate sought inclusion in rate base of additional generating capacity in two out-of-state plants. The Commission allowed rate base treatment of these plants, determining that the additions to Interstate's generating capacity were prudent and beneficial. In so doing, however, the Commission stated that it intended to put Interstate on notice that any future generating plant additions acquired by Interstate as part of its system serving Minnesota ratepayers must first be approved by the Minnesota Commission pursuant to Minn. Stat. § 216B.50 (1986). Interstate claims that Minn.Stat. § 216B.50 applies only to Minnesota systems, and not out-of-state plants.

## ISSUES

1. Did the Commission err by determining that the Carroll County project construction never progressed beyond the planning stage, and that expenses other than preliminary expenses were imprudent and should not be amortized?

2. Did the Commission err by determining that Interstate's decision to participate in the Guthrie County project was imprudent because Interstate's forecasting methods were improper?

3. Did the Commission err by determining that AFUDC should not be amortized because the White–Eldorado and Carroll County projects never reached the construction stage?

4. Did the Commission erroneously order a 10–year amortization period for cancelled project costs?

5. Did the Commission err by determining that coal located at the Keokuk facility was not reasonably available as inventory?

6. Did the Commission err by disallowing the Keokuk litigation expenses?

7. Did the Commission err by determining that future out-of-state acquisitions must be approved by the Minnesota Commission?

## ANALYSIS

*Scope of Review.*

■ We will ordinarily defer to an agency's expertise and its special knowledge in the field of its technical training, education, and experience. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977). The legislature has indicated that an agency's decision may be reversed or modified if the decision is:

(a) In violation of constitutional provisions; or

\* \* \* \* \* \*

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1986).

■ A proceeding before the Commission involves two distinct agency functions: a legislative function and a quasi-judicial function. Minn.Stat. § 216A.05, subd. 1 (1986). The standards for reviewing these functions differ. A factual determination is reviewed under the substantial evidence test, while a legislative determination must be upheld unless it is established by clear and convincing evidence that the Commission has exceeded the scope of its authority, or the decision has resulted in unjust, unreasonable, or discriminatory rates, or has produced an arbitrary result. *Hibbing Taconite Co. v. Minnesota Public Service Commission*, 302 N.W.2d 5, 9 (Minn.1980).

1. Carroll County Project.

The Minnesota legislature has provided that rates received by any public utility must be "just and reasonable." Minn.Stat. § 216B.03 (1986). The Commission has the authority to determine what constitute "just and reasonable" rates. Minn.Stat. § 216B.16, subd. 6.

■ Prudency of investment is a fundamental consideration in determining whether a utility's proposed rates are just and reasonable. *See* Minn.Stat. § 216B.16,

subd. 6; *Minneapolis Street Railway Co. v. City of Minneapolis*, 251 Minn. 43, 58, 86 N.W.2d 657, 668 (1957).

■ Here, the Commission disallowed amortization of all but preliminary planning expenses incurred in the Carroll County project, determining that other expenses were "not necessary." The Commission specifically distinguished between Interstate's initial decision to enter into the Carroll County project, which it viewed as "prudent," and Interstate's decisions thereafter. Implied within the Commission's entire analysis is a finding that the costs following the preliminary planning stage were "imprudent." We believe the Commission properly disallowed amortization of imprudent costs.

■ Nevertheless, without explanation, the Commission allowed amortization of certain expenses as "preliminary," yet disallowed certain other expenses incurred during the same period of time. Relying upon Interstate's Exhibit 23, the Commission allowed amortization of "preliminary engineering expenses," which were incurred through 1984. This same exhibit reveals that administrative and legal expenses and land acquisition costs were incurred prior to 1976. The Commission's failure to explain why these expenses should not also be characterized as "preliminary" requires remand.

> A reviewing court cannot intelligently pass judgment on the PSC's [Commission's] determination unless it knows the factual basis underlying the PSC's determination. Judicial deference to the agency's expertise is not a substitute for an analysis which enables the court to understand the PSC's ruling. Henceforth, we deem it necessary that the PSC set forth factual support for its conclusion. The PSC must state the facts it relies on with a reasonable degree of specificity to provide an adequate basis for judicial review. We do not require great detail but too little will not suffice.

*Hibbing Taconite Co.*, 302 N.W.2d at 12.

2. Guthrie County Project.

■ The Commission found that Interstate's decision to participate in the Guthrie County project was not prudent, and disallowed amortization of all expenses incurred in connection with that project. The Commission reasoned that Interstate's forecasting methods in 1979 were outdated, and should have been changed to reflect a shift in the pattern of peak load growth following the oil embargo of 1973. Specifically, the Commission noted that factors such as conservation should have led Interstate to change its forecasting methods by 1979.

The forecasting method used by Interstate was a trend analysis approach, based upon historical peak load growth rates. The most recent 10-year period was used to obtain historical data. Interstate's major industrial customers were deleted, and the remaining were trended using a least squares fit method of regression analysis.

An examination of Interstate's Exhibit 25, upon which the Commissioner relied, does not necessarily support the Commission's determination that Interstate's own data prior to 1979 demanded a change in forecasting method. Nevertheless, there is other evidence in the record which supports the Commissioner's determination that Interstate should have changed its forecasting method by 1979. A statistical analyst with the Minnesota Department of Public Service, Vincent Chavez, testified at great length concerning Interstate's forecasting method. Chavez stated that Interstate's historical trend model did not respond to specific changes in prices, income, conservation, population, weather and electricity end-use. He also stated that Interstate's method did not employ available forecasting techniques, and that its method depended upon the future repetition of patterns observed in the past. Chavez testified:

> A major problem with trend analysis methods is that they are simple extrapolations of the past. They do not explain the change. If conditions change, the forecast will be erroneous. Trend models are not reliable to do long range forecasting. Trend models will have differing results depending on the time frame incorporated in the data stream.

This should have been recognized by the system planners.

In surrebuttal testimony, Chavez stated: "Since 1967, the Company has consistently ignored warning from regulators to change forecasting techniques. This has led to imprudent generation planning decisions."

Interstate's contention that Chavez improperly relied upon subsequent data, unknown to Interstate in 1979, is refuted by the above testimony. While Chavez did introduce post–1979 data to support his statements, he also testified: "I have used techniques known at the time and data that was available to the Company at the time." In view of this evidence, we cannot substitute our judgment for that of the Commission. There is substantial evidence supporting the Commission's determination that Interstate's forecasting methods should have been modified at the time Interstate entered into the Guthrie County project, and that reliance upon past forecasting methods was imprudent.

### 3. Allowance for Funds Used During Construction.

The Commission disallowed amortization of interest on the three cancelled projects because construction had never begun. The Commission characterized the interest as allowance for funds used during construction (AFUDC), and noted that the Uniform System of Accounts used by utilities in Minnesota does provide for accrual of AFUDC on construction work in progress; however, because construction on the projects was never begun, the Commission concluded that the projects could not be considered "construction work in progress."

In *Butler Taconite Project v. Minnesota Public Utilities Commission*, 332 N.W.2d 649 (Minn.1983), the court defined the term "AFUDC" or "AFDC":

Traditionally, a return on a public utility's investment in new construction has been deferred until the new plant goes into service so that the rates assessed current ratepayers provide a return only with respect to property from which the ratepayers derive current benefit. Postponement of the return is achieved through accounting devices prescribed by statute and regulations: to the extent construction work in progress (CWIP) is included in the rate base, an allowance for funds used during construction (AFDC)—an amount equivalent to the financing or carrying cost of the funds used for construction purposes—is treated as if it were income for purposes of determining the public utility's return on its property. Thus, the AFDC imputed income offsets the current return on the property during the construction period. When the construction is completed and the new plant goes into service, the capitalized AFDC becomes part of the rate base and the rates will include a return on the total investment, including AFDC, during the useful life of the plant.

*Id.* at 651.

As *Butler* indicates, AFUDC is simply an accounting procedure by which the financing or carrying costs of funds used for construction are treated as income for purposes of offsetting rate base treatment of the costs of construction work in progress. If, in fact, there was no construction work in progress, as the Commission determined, the CWIP would not have been included in rate base; thus, the AFUDC treatment of the financing or carrying costs of the funds as offsetting income would not be proper.

We therefore agree with the Commission's determination that interest on the cancelled projects should not have been considered AFUDC on Interstate's accounts. The Commission in several other instances has disallowed the inclusion of preliminary survey and investigation costs as CWIP in a utility's rate base. If CWIP is disallowed, we believe that an offset for AFUDC would likewise be improper during the preconstruction stage.

We also note that the Federal Power Commission uniform system of accounts[4]

---

**4.** Minn.R. 7825.0300, subpt. 2 (1987) states that Minnesota public utilities must conform to the Federal Power Commission uniform system of accounts.

states: "No allowance for funds used during construction charges shall be included in these accounts upon expenditures for construction projects which have been abandoned." 18 C.F.R. pt. 101, "Electric Plant Instructions," 3.A.(17) (1987). Likewise, AFUDC should not be included in the utility's accounts.

Nevertheless, whether or not the carrying costs were considered AFUDC on Interstate's books, the costs were in fact incurred. The Commission's characterization of those costs as AFUDC does not answer the question whether the costs should be carried by the shareholders or amortized and thus charged to the ratepayers.

■ The fact that the actual construction of the projects never began is not a valid basis upon which to distinguish interest costs from other costs which the Commission did allow. We therefore remand to the Commission for reconsideration of this issue.

#### 4. Period of Amortization.

Interstate requested a five-year amortization period for costs of the Carroll County and Guthrie County projects, and a three-year amortization period for the White–Eldorado costs. Interstate argues that if it is forced to amortize its costs over a 10–year period, as the Commission required, its investors will receive a return of their investment equivalent to only 62% of the allowed costs.[5]

■ The Commission must balance the interests of shareholders and ratepayers when determining an appropriate amortization period. One commentator has addressed this issue as follows:

[O]n a hypothetical cancellation loss of $100,000,000 to be amortized over five years, ratepayers would pay through their rates approximately $100,000,000. If the loss is not included in rate base, investors will not earn a return on their $100,000,000 investment, although they will recover their investment over five years. Assuming FERC [Federal Energy Regulatory Commission] allowed the utility to earn a ten percent return on its rate base, investors would be denied $25,000,000 in earnings over the five-year period in this hypothetical loss. Thus, in this hypothetical illustration, ratepayers pay $100,000,000 for a cancelled plant which obviously will not provide any power, while investors forego $25,000,000 in prospective return.

Wilson, *Ratemaking Treatment of Abandoned Generating Plant Losses*, 8 Wm. Mitchell L.Rev. 343, 347–48 (1982) (footnote omitted). This hypothetical demonstrates that if a five-year amortization period were adopted, ratepayers would pay more for a cancelled plant of no use to them than investors would lose in return of investments. While the use of a 10–year amortization period does reduce investors' return of their investments, we believe the commensurate reduction in costs to ratepayers justifies the use of the longer amortization period.

#### 5. Keokuk Coal Inventory.

■ The Commission found that the coal at Interstate's Keokuk, Iowa site should not be considered inventory for Interstate's Lansing, Iowa plant. In response to questioning, Interstate's own Director of Power Production, Earl Forslund defined "inventory" as "something that is readily available in case of transportation problems with coal supply to a plant" or "something that's there to protect against the loss of delivery of fuel." Here, since the Keokuk coal supply was 300 miles away from the Lansing plant and had to be shipped there by barge, we agree with the Commissioner's determination that the coal should not be allowed rate base treatment as at-plant inventory.

Interstate admits, however, that the Keokuk coal supply does not fill a need for security of fuel supply. Rather, Interstate

---

5. The testimony cited by Interstate consists of a statement by an Attorney General witness that a longer period of amortization results in a lower value of dollars returned to the investors. Thus, while the actual 62% figure cited by Interstate is not supported by the record, there is testimony supporting Interstate's claim that adoption of a 10–year amortization period will reduce investors' return of their investments.

argues that the coal should receive rate base treatment because it fills a need for transportation of coal to serve the Lansing plant. In fact, Forslund testified that Interstate did not regard the coal as at-plant inventory, but viewed it as part of the transportation system between the Wyoming mine and the Lansing plant.[6] Forslund explained that when the decision was made to build the Lansing plant, the option of rail transportation of coal up the river was rejected because of the railroad's poor trackage, branch line condition, and finances. Other transloading sites were also considered and rejected for various reasons. Forslund indicated that "at the time it wasn't even a question of least cost. It was a question of the only way to do it."

The Commission's order does not address Interstate's claim that the coal at the Keokuk site constitutes working capital. However, whether the coal is considered inventory or working capital, it is still coal; the important question is whether it may receive rate base treatment. The Commission accepted the ALJ's determination that a 90–day average fuel inventory should be allowed in Interstate's rate base, and this determination has not been appealed. To find that additional coal may be allowed rate base treatment under a different theory would circumvent the Commission's determination that a 90–day fuel supply is reasonable.

Contrary to Interstate's assertion, the Commission's failure to allow rate base treatment of the Keokuk coal inventory is supported by the record and does not deprive Interstate of its property without due process. Under Minn.Stat. § 216B.16, subd. 6, only costs which are reasonable may receive rate base treatment, and the Commission found that only a 90–day fuel supply was reasonable. *See Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia,* 262 U.S. 679, 690, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923) ("There must be a fair return upon the reasonable value of the property at the time it is being used for the public")

(quoting *Willcox v. Consolidated Gas Co.,* 212 U.S. 19, 41, 29 S.Ct. 192, 195, 53 L.Ed.2d 382 (1909)).

### 6. Keokuk Litigation Expenses.

■ The Commission determined that ownership of the transloader at the Keokuk site was a relevant factor in its determination that Interstate's ratepayers should not pay the legal expenses of the lawsuit commenced by Iowa Gateway. We agree. The record indicates that the transloader was an independent, non-regulated business. Interstate's own witnesses testified that, at the time of the lawsuit, Interstate did not own the land or the transloader. The litigation stemmed from an option to repurchase, which Iowa Gateway attempted to exercise. The fact that Interstate became involved in the construction of a non-regulated transloader on land which it did not own itself and for a transloader which it also did not own, is a relevant factor in the decision whether Interstate's ratepayers should bear the legal expenses of a lawsuit involving the ownership of the land.

Interstate has not demonstrated that ownership of the land would affect the supply of coal from the transloader to Interstate's Lansing plant. We agree with the Commission that expenses of litigation in defense of a non-regulated transloading facility owned by another entity are not the type of expenses which should be charged to Interstate's ratepayers.

We also note that the Keokuk litigation spanned the years between 1979 and 1985, while Interstate's request for a rate increase was based upon test year expenses for the 12–month period extending from January 1, 1985 to December 1, 1985. Interstate has failed to establish that the Commission erred by determining that recovery of funds expended prior to the test year would violate the test year concept.

### 7. Acquisition of Out-of-State Capacity.

■ Interstate sought to include in its rate base two Iowa plants. The Commis-

---

**6.** This testimony indicates that the question whether the coal is working capital has not been

raised for the first time on appeal, as the attorney for the Commission claims.

sion allowed the rate base treatment of these plants, determining that such additions to Interstate's generating capacity were prudent and beneficial. In so doing, however, the Commission stated that it intended "to put Interstate on notice that any future generating plant additions acquired by Interstate as part of its integrated system serving Minnesota ratepayers must first be approved by the Minnesota Commission pursuant to Minn.Stat. § 216B.50." Interstate appeals from that ruling, claiming that Minn.Stat. § 216B.50 applies only to Minnesota systems, and not out-of-state plants. We concur with the respondent Commission's argument that the future intent of the Commission is not subject to review at this time.

## DECISION

Affirmed in part, reversed in part and remanded.